ROBERT M. CHEVERIE *v.* ASHCRAFT & GEREL
(AC 20858)

Lavery, C. J., and Foti and Schaller, Js.

Argued May 7—officially released September 4, 2001

*William J. Sweeney, Jr.*, with whom, on the brief, was *Katarzyna Maluszewski*, for the appellant (defendant).

*Joseph D. Garrison*, with whom, on the brief, was *Monika Lahiri Escoriaza*, for the appellee (plaintiff).

*Opinion*

SCHALLER, J. The defendant, Ashcraft & Gerel, appeals from the judgment of the trial court rendered in favor of the plaintiff, Robert M. Cheverie, denying the defendant's application to vacate an arbitration award. On appeal, the defendant claims that the court improperly (1) failed to utilize a de novo standard of review because its challenge to the award was based on a public policy argument, (2) concluded that the arbitrator did not misapply the law by finding that the plaintiff met his burden of proof in establishing that the parties had entered into a contract and (3) denied the defendant's motion for reargument. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to our disposition of the appeal. This dispute arises out of an arrangement between the plaintiff, a Connecticut attorney, and the defendant, a law firm based in Washington, D.C., which deals with asbestos litigation. The defendant was interested in hiring the plaintiff to open and to manage a branch office in Hartford to

enable the defendant to expand its asbestos litigation practice into Connecticut. The defendant was particularly interested in hiring the plaintiff because of his access to potential asbestos cases through unique business relationships, namely, ones he had developed with union leaders during his five years of working for the National Labor Relations Board. In 1985, the defendant hired the plaintiff to operate its Hartford office. Both parties seemed content with the arrangement because, as expected, the plaintiff brought in a substantial number of asbestos cases.

In 1987, however, the plaintiff became dissatisfied with his compensation. He met with Martin E. Gerel, a senior partner of the defendant, to address that problem. The plaintiff informed Gerel that he would leave the firm unless his compensation could be enhanced. As a result, on or about July 16, 1987, the parties entered into a written contract, whereby they agreed that the plaintiff would receive a percentage of gross fees for all cases originating from the Hartford office. The contract reads as follows: "It is agreed between Robert Cheverie and Ashcraft and Gerel (hereinafter the Firm) that in consideration of the efforts of Mr. Cheverie on behalf of the Firm, and his continued employment with the Firm, the Firm will pay him on a quarterly basis, a commission on all asbestos cases originating in Connecticut, settled or adjudicated, equal to 10% of the gross fees generated; and in any year in which the gross fees generated during that year exceed $500,000.00, the commission for the amount in excess thereof shall be 12 1/2% of the gross fees generated."

The defendant honored the contract until December 30, 1991, when it closed the Hartford office. At that time, none of the numerous asbestos cases that the plaintiff had originated had been resolved. The delay, however, did not trouble the parties, as they were aware that asbestos cases typically require a significant

amount of time to resolve. Before the Hartford office closed, a partner of the defendant went to the Hartford office to coordinate the closing process and to make individual agreements with the four attorneys there, including the plaintiff. The plaintiff, in meeting with the partner, orally agreed that he would act as local counsel on behalf of the firm even after the Hartford office closed. The partner also assured the plaintiff that the defendant would honor the parties' previous written contract. Specifically, the partner assured the plaintiff that, regardless of his termination as an employee, he would be paid his percentage of gross fees for the cases that originated from the Hartford office as soon as the cases were resolved. There was no discussion, however, with respect to the plaintiff's continued referral of new cases to the defendant once it closed the Hartford office.

After the defendant closed its Hartford office, the plaintiff opened his own law firm in January, 1992. He remained involved as local counsel on behalf of the defendant.

In December, 1992, the plaintiff developed a new relationship with another asbestos litigation firm, Ferraro & Associates, P.A. (Ferraro). The parties entered into a referral agreement under which the plaintiff would receive one third of fees derived from any matter that he referred to Ferraro. In the early part of 1994, the plaintiff informed the defendant of that arrangement.

Thereafter, while still acting as local counsel on behalf of the defendant, the plaintiff became aware that the defendant had settled several of the asbestos cases that had originated from the Hartford office prior to its closing. When he did not receive his percentage of fees, the plaintiff contacted two partners of the defendant to inquire about the matter. The partners informed him that the defendant had not yet been paid and that, as

soon as it was paid, he would be paid. Despite such assurances, the defendant failed to pay the plaintiff his fees. The defendant claimed that it failed to do so because it considered the written contract with the plaintiff to be null and void due to his subsequent referral agreement with Ferraro.

To collect his fees, the plaintiff filed an action against the defendant in the Superior Court for the judicial district of New Britain. He claimed breach of a written contract, breach of an oral contract, unjust enrichment and negligent misrepresentation. The defendant responded that there was no written agreement between the parties and no oral agreement between the parties, and that if there were an enforceable agreement, the plaintiff had breached it. While the matter was pending in court, the plaintiff filed a demand for arbitration in accordance with the parties' written agreement.[1] Accordingly, the matter was thereafter withdrawn from the court.

Pursuant to the demand for arbitration, hearings were held before an arbitrator. Ultimately, the arbitrator decided the matter in favor of the plaintiff.

The defendant, dissatisfied with the arbitrator's decision, filed with the court an application to vacate the arbitration award. In its application, the defendant argued that "(1) the arbitrator refused to hear evidence pertinent and material to the controversy, (2) the arbitrator exceeded his power or imperfectly executed his power [thereby] violating the law, and (3) the arbitrator's decision violated clear public policy." The plaintiff, on the other hand, filed a motion to confirm the arbitration award. The court heard arguments on the matter.

[1] The submission to arbitration was voluntary and unrestricted. According to both parties, the arbitrator was to decide whether there was a valid contract between the parties, if it had been breached by the defendant and, if so, what damages were due.

On May 5, 2000, the court rendered its decision denying the defendant's application to vacate and granting the plaintiff's motion to confirm. After the court rendered its decision, the defendant filed a motion for reargument, which was denied. This appeal ensued.

I

We first consider the defendant's claim that the court improperly failed to utilize a de novo standard of review because the challenge to the arbitration award was based on public policy. Specifically, the defendant argued to the court that the enforcement of the employment agreement, on its face, violated the strong public policy underlying rules 1.5, 1.7, 1.8 and 7.3 of the Rules of Professional Conduct. The defendant contends that its mere assertion of a public policy argument required the court to conduct a de novo review of the arbitration award. We disagree.

"The standard of review relative to arbitration awards depends on the nature of the challenge. With a voluntary, unrestricted submission to an arbitrator, as is the case before us, the court may only examine the submission and the award to determine whether the award conforms to the submission. . . . *Hartford* v. *International Assn. of Firefighters, Local 760*, 49 Conn. App. 805, 814, 717 A.2d 258, cert. denied, 247 Conn. 920, 722 A.2d 809 (1998). In making such a comparison when the submission is unrestricted, the court will not review the evidence or legal questions involved, but is bound by the arbitrator's legal and factual determinations. *Game-A-Tron Corp.* v. *Gordon*, 2 Conn. App. 692, 695, 483 A.2d 620 (1984).

"Certain conditions do exist, however, under which we conduct a more searching review of arbitral awards. In *Garrity* v. *McCaskey*, 223 Conn. 1, 6, 612 A.2d 742 (1992), our Supreme Court reiterated that there are three grounds for vacating an award when the submission is unrestricted. These grounds arise when the

award (1) rules on the constitutionality of a statute, (2) violates clear public policy or (3) contravenes one or more of the statutory proscriptions of General Statutes § 52-418." *State* v. *AFSCME, Council 4, Local 2663, AFL-CIO*, 59 Conn. App. 793, 796, 758 A.2d 387, cert. denied, 255 Conn. 905, 762 A.2d 910 (2000). Because the defendant's challenge here implicates only the second exception, it will be the focus of our discussion.

Our Supreme Court in *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, 252 Conn. 416, 747 A.2d 1017 (2000), enunciated the proper standard of review for determining whether an arbitral decision violates a clear public policy. It stated: "Where there is no clearly established public policy against which to measure the propriety of the arbitrator's award, there is no public policy ground for vacatur. If, on the other hand, it has been determined that an arbitral award does implicate a clearly established public policy, the ultimate question remains as to whether the award itself comports with that policy. We conclude that where a party challenges a consensual arbitral award on the ground that it violates public policy, and *where that challenge has a legitimate, colorable basis,* de novo review of the award is appropriate in order to determine whether the award does in fact violate public policy." (Emphasis added.) Id., 429.

The court, however, feared a considerable increase in such challenges. It therefore cautioned against granting de novo review for a bare public policy claim. The court noted: "We emphasize, however, that a party raising such a challenge to an arbitral award may not succeed in receiving de novo review merely by labeling its challenge as falling within the public policy exception to the normal rule of deference. The substance, not the form, of the challenge will govern. Thus, the court

should not afford de novo review of the award without first determining that the challenge truly raises a legitimate and colorable claim of violation of public policy. If it does raise such a claim, de novo review should be afforded. If it does not, however, the normal deferential scope of review should apply." Id., 429 n.7.

Recently, this court had the opportunity to clarify the standard annunciated in *Schoonmaker*. In *State* v. *AFSCME, Council 4, Local 2663, AFL-CIO*, supra, 59 Conn. App. 797, we held that *Schoonmaker* "require[s] a two-step analysis in cases such as this one in which a party raises the issue of a violation of public policy in an arbitral award. First, we must determine whether a clear public policy can be identified. Second, if a clear public policy can be identified, we must then address the ultimate question of whether the award itself conforms with that policy." Accordingly, we must determine whether each of the defendant's public policy claims satisfies this two step analysis, thereby warranting de novo review of the arbitration award.

A

The defendant first argues that de novo review of the arbitration award was warranted because enforcement of the employment agreement, on its face, violates the strong public policy underlying rule 1.5 of the Rules of Professional Conduct. We are not persuaded.

The defendant' claim fails under the first prong of the analysis, as the defendant cannot identify any *clear* public policy embodied in rule 1.5. "A public policy challenge to an arbitration award is rooted in the principle that the parties cannot expect conduct which is illegal or contrary to public policy to receive judicial endorsement any more than parties can expect a court to enforce such a contract between them. . . . Accordingly, the public policy exception to arbitral authority should be narrowly construed and [a] court's refusal

to enforce an arbitrator's interpretation of [collective bargaining agreements] is limited to situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." (Citation omitted; internal quotation marks omitted.) Id., 797–98.

We hold that rule 1.5 of the Rules of Professional Conduct does not meet that demanding standard. Rule 1.5 addresses the reasonableness of attorney's fees,[2] and there is no doubt that it is an important rule. Nevertheless, we cannot say that it rises to the level of a well defined and dominant public policy. The defendant fails to cite any authority that would lead us to conclude otherwise. Indeed, review of the case law buttresses our conclusion. In *Schoonmaker*, our Supreme Court noted its position on the issue of whether rule 1.5 embodies a legitimate public policy. When the defendants in that case posited a hypothetical regarding rule 1.5 to illustrate the potential for opening the floodgates of litigation, the court responded in the following manner: "The inquiry into the 'reasonableness' of attorney's fees under rule 1.5, however, although legal in nature, is intensely factual in application and as stated previously, we do not digress from the principle of deference to an arbitrator's findings of fact. Additionally, *it is doubtful that such an issue implicates a legitimate public policy. . . .* Consequently, we consider the defendants' concerns to be unfounded." (Emphasis added.) *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, supra, 252 Conn. 435 n.12. Although

---

[2] The only relevant portion is rule 1.5 (e), which deals with the division of fees between attorneys. That section provides: "A division of fee between lawyers who are not in the same firm may be made only if:

"(1) The client is advised of the compensation sharing agreement and of the participation of all the lawyers involved, and does not object; and

"(2) The total fee is reasonable."

that language is dictum, we view it as illuminating. We conclude that rule 1.5 of the Rules of Professional Conduct does not implicate a legitimate public policy and, therefore, the court properly refused to conduct a de novo review of the arbitration award.

B

The defendant also contends that the court improperly failed to conduct a de novo review of the arbitration award because enforcement of the employment agreement violates the clear public policy embodied in rule 1.7 of the Rules of Professional Conduct. We do not agree.

Even if we assume arguendo that the defendant satisfies the first prong of the *Schoonmaker* analysis by identifying a clear public policy embodied in rule 1.7,[3] it cannot satisfy the second prong. The defendant must demonstrate under the second prong that the arbitration award itself does not conform with the legitimate public policy. Any bare claim under that prong, however, is not enough to invoke de novo review. Instead, before a court will conduct de novo review, the party alleging a public policy violation must show, at a minimum, that a colorable claim exists. See id., 429 n.7. If the party cannot, then the court is not bound to conduct a de novo review of the arbitration award. The defendant alleges that the award undermines rule 1.7. That rule concerns conflicts of interest that may arise when an attorney represents a client and such representation will be directly adverse to another client.[4] Here, the

---

[3] We emphasize that we make no determination as to whether rule 1.7 embodies a legitimate public policy and leave that issue for another day.

[4] Rule 1.7 of the Rules of Professional Conduct provides: "Conflict of Interest: General Rule

"(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

"(1) The lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

"(2) Each client consents after consultation.

"(b) A lawyer shall not represent a client if the representation of that

defendant did not specify how the parties' conduct violated that rule. Quite the contrary, it merely made bare assertions that rule 1.7 was implicated. The court found, and we agree, that it saw "no facts here of a possible adverse result for any one of the clients here by virtue of the plaintiff representing another." Under those circumstances, we conclude that the defendant failed to demonstrate that a colorable claim exists with respect to a public policy violation of rule 1.7 of the Rules of Professional Conduct. Accordingly, the court properly refused to conduct a de novo review of the award.

C

The defendant also argues that the court should have conducted a de novo review of the arbitration award because enforcement of the employment agreement contravenes the strong public policy underlying rule 1.8 of the Rules of Professional Conduct. We disagree.

The defendant cannot satisfy the second prong of the *Schoonmaker* analysis because it fails to demonstrate that the arbitration award itself does not conform with the legitimate public policy, if any,[5] embodied in rule 1.8. We reemphasize that under the second prong, the defendant must, at the very least, make a threshold showing that a colorable claim exists before de novo review is warranted. Pursuant to rule 1.8, an attorney is prohibited from engaging in a variety of transactions that may give

client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

"(1) The lawyer reasonably believes the representation will not be adversely affected; and

"(2) The client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved."

[5] We need not decide whether the defendant satisfied the first prong of the *Schoonmaker* analysis by identifying a clear public policy embodied in rule 1.8. Assuming that it did so, the defendant would nevertheless fail the second prong of that analysis.

rise to a conflict of interest. As the court noted, the only possible relevant portion of that rule is 1.8 (f),[6] which deals with situations in which the attorney receives compensation from one other than his or her client. The defendant, once again, failed to articulate how the employment agreement with the plaintiff implicated that rule. Pursuant to the agreement, the plaintiff was entitled to receive a percentage of the fees derived from the client's award. We agree with the court's finding that this arrangement in no way implicates rule 1.8 (f). In light of the defendant's failure to assert a colorable claim of a public policy violation, we conclude that de novo review of the award was not warranted.

## D

The defendant also asserts that a de novo review of the arbitration award was warranted because enforcement of the employment agreement violates the clear public policy embraced in rule 7.3 of the Rules of Professional Conduct. We are unpersuaded.

Because the defendant cannot identify any legitimate public policy embodied in rule 7.3, it fails to satisfy the first prong of the *Schoonmaker* analysis. We reiterate that "the public policy exception to arbitral authority should be narrowly construed and [a] court's refusal to enforce an arbitrator's interpretation of [collective bargaining agreements] is limited

---

[6] Rule 1.8 (f) of the Rules of Professional Conduct provides: "A lawyer shall not accept compensation for representing a client from one other than the client unless:

"(1) The client consents after consultation;

"(2) There is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and

"(3) Information relating to representation of a client is protected as required by Rule 1.6."

to situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." (Internal quotation marks omitted.) *State* v. *AFSCME, Council 4, Local 2663, AFL-CIO,* supra, 59 Conn. App. 798.

After reviewing rule 7.3 of the Rules of Professional Conduct, we conclude that it fails to satisfy that rigorous standard. Rule 7.3 limits attorneys' efforts to solicit legal business from nonclients. Although that is an important rule, we cannot discern from it a well defined and dominant public policy. Any connection that the rule may have to a legitimate public policy is, at best, tenuous. We conclude, therefore, that the court was not required to conduct a de novo review of the arbitration award.

II

The defendant also claims that the court improperly concluded that the arbitrator did not misapply the law by finding that the plaintiff met his burden of proof in establishing that the parties had entered into a contract. As such, the defendant argues that the arbitration award should be set aside pursuant to § 52-418 (a) (4),[7] as it manifests an egregious or irrational application of the law. We do not agree.

As previously noted in part I, our standard of review applicable to an arbitration award normally is deferential unless the award "(1) rules on the constitutionality

---

[7] General Statutes § 52-418 (a) provides in relevant part: "Upon the application of any party to an arbitration, the superior court for the judicial district in which one of the parties resides or, in a controversy concerning land, for the judicial district in which the land is situated or, when the court is not in session, any judge thereof, shall make an order vacating the award if it finds any of the following defects . . . (4) if the arbitrators have exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made."

of a statute, (2) violates clear public policy or (3) contravenes one or more of the statutory proscriptions of General Statutes § 52-418." *State* v. *AFSCME, Council 4, Local 2663, AFL-CIO*, supra, 59 Conn. App. 796. The defendant's claim here solely concerns the latter exception.

"[A]n award that manifests an egregious or patently irrational application of the law is an award that should be set aside pursuant to § 52-418 (a) (4) because the arbitrator has exceeded [his] powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made. We emphasize, however, that the manifest disregard of the law ground for vacating an arbitration award is narrow and should be reserved for circumstances of an arbitrator's extraordinary lack of fidelity to established legal principles.

"So delimited, the principle of vacating an award because of a manifest disregard of the law is an important safeguard of the integrity of alternate dispute resolution mechanisms. Judicial approval of arbitration decisions that so egregiously depart from established law that they border on the irrational would undermine society's confidence in the legitimacy of the arbitration process. . . . Furthermore, although the discretion conferred on the arbitrator by the contracting parties is exceedingly broad, modern contract principles of good faith and fair dealing recognize that even contractual discretion must be exercised for purposes reasonably within the contemplation of the contracting parties. . . .

"In *Garrity*, we adopted the test enunciated by the United States Court of Appeals for the Second Circuit in interpreting the federal equivalent of § 52-418 (a) (4). . . . The test consists of the following three elements, all of which must be satisfied in order for a court to

vacate an arbitration award on the ground that the arbitration panel manifestly disregarded the law: (1) the error was obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator; (2) the arbitration panel appreciated the existence of a clearly governing legal principle but decided to ignore it; and (3) the governing law alleged to have been ignored by the arbitration panel is well defined, explicit, and clearly applicable." (Internal quotation marks omitted.) *Preston* v. *State, Division of Criminal Justice*, 60 Conn. App. 853, 862–63, 761 A.2d 778 (2000), cert. denied, 255 Conn. 936, 767 A.2d 1212 (2001).

In the present case, the defendant cannot satisfy the first element, as it fails to demonstrate any obvious error in the application of the law regarding contract formation. The plaintiff, according to the defendant, failed to demonstrate a meeting of the minds between the parties. The defendant correctly notes that "the burden rested on the plaintiff to prove a meeting of the minds to establish [his] version of the claimed contract." *Bridgeport Pipe Engineering Co.* v. *DeMatteo Construction Co.*, 159 Conn. 242, 246, 268 A.2d 391 (1970). It failed to acknowledge, however, that the issue of contract formation is a question of fact. "The existence of a contract is a question of fact to be determined by the trier on the basis of all the evidence. . . . To form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties. . . . To constitute an offer and acceptance sufficient to create an enforceable contract, each must be found to have been based on an identical understanding by the parties." (Internal quotation marks omitted.) *Richter* v. *Danbury Hospital*, 60 Conn. App. 280, 288, 759 A.2d 106 (2000). Because the defendant's claim involves a finding of fact, we must "adhere to the longstanding principle that findings of fact are ordinarily

left undisturbed upon judicial review." *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, supra, 252 Conn. 432 & n.8. Accordingly, the court correctly refused, as do we, to substitute its judgment regarding the facts for that of the arbitrator. We conclude, therefore, that the court properly concluded that the arbitrator did not misapply the law by finding that the plaintiff met his burden of proof in establishing that the parties had entered into a contract.

### III

We next consider the defendant's claim that the trial court improperly denied its motion for reargument. That claim is without merit.

We stress that "[o]ur . . . review regarding challenges to a trial court's ruling on such a motion is [an] abuse of discretion [standard]." *Taylor* v. *Taylor*, 57 Conn. App. 528, 534, 752 A.2d 1113 (2000). In its motion, the defendant sought reargument because *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, supra, 252 Conn. 416, had been released after the court's hearing. The defendant argues that such authority would have altered the court's conclusion on the public policy issue. We disagree. Because we concluded in part I that the *Schoonmaker* criteria were not satisfied, we cannot conclude that the court abused its discretion in denying the motion for reargument. Other than *Schoonmaker*, the defendant failed to provide the court with any authority that would warrant a change in its decision. We conclude, under those circumstances, that the court did not abuse its discretion in denying the defendant's motion for reargument.

The judgment is affirmed.

In this opinion the other judges concurred.