[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
CT Page 2449
Findings of Fact:
This action was brought by Norman Lipshie as Executor of the estate of Geraldine Lipshie, his former wife, who was record owner of the property in this action.
In 1981, the Lipshies purchased property located at 162 Millerton Road, Lakeville, Connecticut. At that time the Lipshies resided in New York City and had purchased the property for a weekend and vacation residence.
The property at 162 Millerton Road abutted 98 feet of lakefront on Lake Wononscopomuc and then sloped on an incline to the roadway. The property contained a main house at the bottom of the hill by the lakefront and a separate cottage located at the top of the hill.
The defendant, George M. Taylor Son, Inc. ("Taylor Oil"), is a corporation with business addresses in Dover Plains and Millerton, New York. Due its location and proximity to the area Taylor Oil did business in Connecticut, as well as, New York. Thomas Taylor is an owner and Vice President of Taylor Oil.
The Lipshies began doing business with Taylor Oil in the mid 1980's through 1997. Taylor Oil provided oil delivery, as well as, repair and maintenance of the heating systems on the property. Taylor Oil and the Lipshies had no written agreement to provide these services relying on an oral "handshake" agreement over the years.
By the mid 1990's, Geraldine Lipshie, the decedent, became seriously ill. The Lipshies use of the Millerton Road property began to decrease. This prompted the Lipshies to list the property for sale in 1996.
The Lipshies listed the property with Albert Borden Realtors located in Lakeville, Connecticut. Pat Best was a broker employed by Borden. In August of 1996, Best produced a purchaser for the property, Melissa Bostrum.
An option agreement was executed in August 1996, for the purchase of the property. The purchase price was $700,000. The option was to be exercised between January 1, 1997, and January 31, 1997. There were several reasons for the option to be exercised in 1997, which suited both the Lipshies and Bostrum. CT Page 2450
The option agreement did have a contingency. The contingency was:
 5. Purchaser has inspected the premises, including inspection of plumbing, heating, septic and electric systems, water potability test and radon test and accepts the premises in the condition they are at the time of the execution of this option. Seller shall maintain the premises in its present condition during the option period. Minor repairs are to be considered normal maintenance and the responsibility of the Seller, and will not be considered cause for terminating the option agreement.
 Notwithstanding the foregoing, Seller, at Seller's expense prior to the execution of the Contract of Sale, shall remove the underground fuel tank and any soil contamination should any be discovered on the premises in a manner consistent with the standard of the Connecticut Department of Environmental Protection.
 Purchaser, at Purchaser's expense, prior to execution of Contract of Sale, shall install a replacement tank located in the interior of the guest cottage in a manner consistent with the standards of the Connecticut Department of Environmental Protection. Final decision on the size of the tank and its location shall be made in consultation with the fuel oil supplier. If the option is terminated, the Seller shall reimburse the Purchaser for the cost of the installation of any new tank. Seller shall have the right to approve the cost, fuel dealer and location of the tank.
Norman Lipshie, subsequent to the signing of the option agreement in late August or early September of 1996, contacted Thomas Taylor at Taylor Oil and then met with Taylor in person. Lipshie advised Taylor of the impending sale of the property. He advised Taylor of the need to take care of the contingency as stated above prior to the sale of the property taking place. Taylor agreed to perform the work: the removal of the underground tank, any cleanup as a result thereof and installation of a new tank in the cottage. This agreement was reached orally and conforms with the ongoing relationship the parties had had over the years relative to performing work at the Millerton Road property.
The evidence during trial confirms that from the time of the meeting in late August/early September 1996, between Mr. Lipshie and Mr. Taylor the actual job was not done and completed until December 18, 1996. The evidence confirms that Taylor was contacted by not only Lipshie but also Pat Best, the real estate broker, regarding when the work would be done, as it was anticipated it would have been done sooner than December 18, 1996, when it was actually completed. CT Page 2451
The evidence confirms that Taylor did not apply for a permit to do this work until December 18, 1996. At the time of the application for the permit, the Building Inspector and Deputy Fire Marshall for the Town of Salisbury (Lakeville being within Salisbury's jurisdiction) was Michael Fitting.
Fitting's testimony confirms that Taylor's permit application was not filed until December 18, 1996; that the permit was not signed by Fitting, as the Building Inspector, before Taylor did the work on December 18, 1996; that upon Fitting arriving at the job to inspect the removal of the underground oil tank and installation of the then new oil tank on December 18, 1996, Taylor had already completed all the work.
What was determined by Fitting, and confirmed from the testimony and evidence, was that the underground tank that had been removed had been leaking prior to its removal; that Taylor not only removed the tank but also removed oil contaminated soil from the tank site and then back filled the hole from which the tank was removed; and that Taylor had installed a new oil tank in the furnace room inside the cottage but that said installation was in violation of the Building Code as the oil tank was installed within five (5) feet of the oil burner which the Code prohibits. For these reasons, Fitting did not approve the work done by Taylor.
In spite of these problems, the evidence confirms that Mr. Lipshie was advised on December 18, 1996, or within the next few days thereafter by either Mr. Taylor himself or the manager of Taylor Oil, Ron Brant, that the work had been completed and that everything had gone fine regarding the removal of the oil tank and installation of the new tank. Mr. Lipshie was not advised of any problems with the removal of the oil tank, any contamination of the soil, or the installation of the new oil tank by any representative of Taylor Oil at that time.
Pat Best, the real estate broker, also called Taylor Oil during this time period. She wished to confirm that the work was done and that all had gone well. She was advised by a Taylor Oil representative that all the work had been performed by Taylor Oil and that there was no contamination at the site or any other problems with the work done.
Sometime at the end of January, 1997, after the Lipshie's executed a contract of sale with Melissa Bostrom for the Millerton Road property for the sale price of $700,000, they became aware, for the first time, that in fact the oil tank removed from the ground had had a leak and that the new oil tank was installed in violation of Code.
Attorney Alice Yoakum, who was representing the Lipshie's in the real CT Page 2452 estate sale, received a fax of the building inspection notice by Mr. Fitting (Exhibit 4) and the DEP notice (Exhibit 6) on January 28, 1997. She, on January 29, 1997, faxed a copy of these notices to Taylor Oil to obtain an answer to these problems. At about that time the Lipshie's were advised of the problems that existed. This was their first notice that a problem with the removal and installation existed.
As a result of receiving this notification, Mr. Lipshie hired a Mr. Florian Palmer to test the site to determine the extent of the contamination. The result of Mr. Palmer's tests was that the property was extensively contaminated with oil, as well as, portions of the abutting property owners land. The contamination needed to be remediated.
In early February, 1997, Tom Taylor of Taylor Oil contacted Mr. Lipshie about the contamination and offered his Company's services to remediate the property. Mr. Lipshie advised Taylor that he did not want Taylor Oil to do any further work for him whatsoever because Taylor failed to notify him of the problems with the removal of the old tank and installation of the new tank.
Mr. Lipshie contacted his homeowner's insurance company regarding the problem, who then hired Lincoln Environmental to do the clean up. Lincoln Environmental commenced work on the property in February, 1997, and did not complete work until mid May, 1997.
The Lipshies contract with Melissa Bostrom required that all remediation be completed by the closing date March 31, 1997. The sale to Melissa Bostrom did not take place. As testified to by Attorney Yoakum, the reason the deal fell apart was due to the remediation not having been completed. (Alice Yoakum Deposition, Exhibit 15, p. 49.)
The property was placed back on the market for sale subsequent to the Bostrom deal not closing. The Lipshies had all the remediation work done by Lincoln Environmental which was paid for by the Lipshies' insurance company. The Lipshies hired Lindell Oil to replace the improperly installed oil tank with a new tank which conformed to Code at a cost of $3,900.
The Lipshies sold the property to another buyer, the Littauers, in February, 1999, for $568,000.
Discussion
The plaintiffs seven count complaint alleges that Taylor Oil did the following:
CT Page 2453 Count 1 — breached its contract with the plaintiff;
 Count 2 — breached a covenant at good faith and fair dealing with the plaintiff;
 Count 3 — was negligent in performing the work in replacing the old tank and installing the new tank;
Count 4 — tortiously interfered with a business relationship;
Count 5 — tortiously interfered with a contract;
Count 6 — made negligent misrepresentations to the plaintiff; and
Count 7 — made intentional misrepresentations to the plaintiff.
The defendants at the end of trial moved to dismiss counts two, four, five and seven as the plaintiff failed to sustain their burden to substantiate these claims.
The court grants the motion to dismiss as to counts two, four, five and seven of the plaintiffs complaint. The court's reasoning is as follows:
Count two, is a claim of breach of the covenant of good faith and fair dealing. This is not a separate contractual claim. Count one of the complaint alleges a breach of contract. Count two is not necessary as it is part of what makes up a breach of contract claim. As noted in ElmStreet Builders, Inc. v. Enterprise Park Condominium Assn. Inc.63 Conn. App. 657, 665 (2001):
 "The common-law duty of good faith and fair dealing implicit in every contract requires that "neither party [will] do anything that will injure the right of the other to receive the benefits of the agreement. . . . Essentially it is a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended." (Citations omitted; internal quotation marks omitted.) Middletown Commercial Associates Ltd. Partnership v. Middletown, 53 Conn. App. 432, 437, 730 A.2d 1201, cert. denied, 250 Conn. 919, 738 A.2d 657 (1999).
For these reasons count two is dismissed.
Count four alleges a claim for tortious interference with a business relationship and count five alleges a claim for tortious interference CT Page 2454 with a contractual relationship. These claims are essentially the same.
In Suffield Dev. Associates Ltd. Partnership v. National LoanInvestors, L.P., 64 Conn. App. 192, 204, cert. granted, 258 Conn. 922
(2001), the court reaffirms the basis for these claims:
 "It is well established that the elements of a claim for tortious interference with business expectancies are: (1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss. Solomon v. Aberman, 196 Conn. 359, 364, 493 A.2d 193
(1985); Herman v. Endriss, 187 Conn. 374, 377, 446 A.2d 9
(1982); Harry A. Finman Son, Inc. v. Connecticut Truck Trailer Service Co., 169 Conn. 407, 415, 363 A.2d 86 (1975)." Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn. 20, 27, 761 A.2d 1268
(2000).
 "An action for tortious interference with a business expectancy is well established in Connecticut. The plaintiff need not prove that the defendant caused the breach of an actual contract; proof of interference with even an unenforceable promise is enough. . . . A cause of action for tortious interference with a business expectancy requires proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . ., or that the defendant acted maliciously. . . . Jones v. O'Connell, 189 Conn. 648, 660, 458 A.2d 355 (1983). It is also true, however, that not every act that disturbs a contract or business expectancy is actionable. Blake v. Levy, 191 Conn. 257, 260, 464 A.2d 52 (1983). A defendant is guilty of tortious interference if he has engaged in improper conduct. Id., 261; see 4 Restatement (Second), Torts §§ 766, 766B, 767 (1979).
In Downes-Patterson Corp. v. First National Supermarkets, Inc.,64 Conn. App. 417, 429, cert. granted, 258 Conn. 917 (2001), the court further expounded on what the plaintiff must plead and prove:
[An] action for intentional interference with business relations . . . requires the plaintiff to plead and prove at least some improper motive or improper CT Page 2455 means. . . . The plaintiff in a tortious interference claim must demonstrate malice on the part of the defendant, not in the sense of ill will, but intentional interference without justification. . . . In other words, the [plaintiff] bears the burden of alleging and proving lack of justification on the part of the [defendant]." (Citations omitted; internal quotation marks omitted.) Daley v. Aetna Life Casualty Co., 249 Conn. 766, 805-806, 734 A.2d 112
(1999).
The court finds that the plaintiff has failed to prove any malice or lack of justification by the defendant. Therefore, counts four and five are dismissed.
Count seven alleges an intentional misrepresentation by the defendant. An intentional misrepresentation is analogous to a claim of fraud. Marron Sipe Building Contracting Corp. v. Flor, 22 Conn. App. 689 (1990). Fraud. . . . "includes all acts, omissions and concealments, by which an undue and unconscientious advantage is taken of another." Pacelli Bros.Transportation, Inc. v. Pacelli, 1891 Conn. 401, 410 (1983).
Again the plaintiff has failed to provide sufficient evidence for the court to find that they have sustained their burden of proof on the intentional misrepresentation claim. The court, therefore, dismisses count seven of the plaintiffs complaint.
The court is left with determining whether the plaintiff has prevailed on the remainder of his/her claims. "Whether there was a breach of contract is ordinarily a question of fact." Paulus v. LaSala,56 Conn. App. 139, 153, cert. denied, 252 Conn. 928 (2000).
The court in Cheverie v. Ashcraft Gerel, 65 Conn. App. 425, 439, cert. denied, 258 Conn. 932, (2001), expanded upon a trier of facts review:
"The existence of a contract is a question of fact to be determined by the trier on the basis of all the evidence. . . . To form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties. . . . To constitute an offer and acceptance sufficient to create an enforceable contract, each must be found to have been based on an identical understanding by the parties." (Internal quotation marks omitted.) Richter v. Danbury Hospital, CT Page 2456 60 Conn. App. 280, 288, 759 A.2d 106 (2000).
This case is one where the parties did not have a written contract for the work, which is at issue in this case. However, the parties did have a long standing oral agreement between them that the defendant would perform necessary services relative to home fuel oil supply and maintenance of furnaces, oil tanks and associated matters relative to home heating for the Millerton Road property. The court concludes that the parties did have a contract, one implied in fact, whereby the Taylor Oil was to remove the underground oil tank, do necessary remediation as a result thereof; and replace the removed tank with a new tank which was indoors in the cottage in the area where the furnace and burner were located.
The basis for concluding that an implied in fact contract existed is based on the following:
 "A contract implied in fact depends on an actual agreement that there be an obligation created by law that imposes a duty to perform, and it may be inferred from words, actions or conduct. . . . It is not fatal to a finding of an implied contract that there were no express manifestations of mutual assent if the parties, by their conduct, recognized the existence of contractual obligations. . . . Whether and on what terms a contractual commitment has been undertaken are ultimately questions of fact which, like any other findings of fact, may be overturned only if the trial court's determinations are clearly erroneous." (Citations omitted; internal quotation marks omitted.) Homecare, Inc. v. Acquarulo, 38 Conn. App. 772, 775, 663 A.2d 412 (1995).
Gould v. Hall, 64 Conn. App. 45, 54 (2001).
The court further concludes that Taylor Oil did not perform the services requested in a timely fashion. The testimony of the plaintiff, Pat Best and deposition testimony of Attorney Alice Yoakum were more credible to the court in reaching this conclusion. All their testimony consistently indicate that Taylor Oil was contacted repeatedly from mid-September 1996 through December 18, 1996, by each of these individuals to determine if Taylor Oil had undertaken the project. The court concludes, as a result of this testimony, that Taylor Oil had the "job" and that it unduly delayed the performance thereof
In addition, the evidence is clear from the testimony of Mr. Fitting CT Page 2457 and the documents in evidence, specifically exhibits four, five, and six, that once Taylor Oil finally did the work it did not perform the work as agreed to/contracted to be done.
Therefore, the court finds that Taylor Oil breached the contract with the Lipshies to do the work in a timely fashion, in a workmanlike fashion and to comply with all State and local regulations, as a licensed contractor in the business of performing these services should have done.
The plaintiff in count three alleges that Taylor Oil was negligent in the performance of the work that the defendant performed on behalf of the plaintiff. The court concludes that due to its finding that a breach of contract did take place the negligence claim does not apply.
Which leaves the final count, count six, alleging negligent misrepresentation for the court to consider.
Negligent misrepresentation has been defined by our Supreme court as stated:
 "One who, in the course of his [or her] business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he [or she] fails to exercise reasonable care or competence in obtaining or communicating the information." (Internal quotation marks omitted.) D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, 202 Conn. 206, 218, 520 A.2d 217
(1987).
 Beverly Hills Concepts, Inc. v. Schatz, Schatz,Ribicoff Kotkin, 247 Conn. 48, 57 (1998).
The court in Citino v. Redevelopment Agency,51 Conn. App. 262, 273-274 (1998), provided the following guidance for the court to follow in negligent misrepresentation claims:
"Whether evidence supports a claim of fraudulent or negligent misrepresentation is a question of fact. J. Frederick Scholes Agency v. Mitchell, 191 Conn. 353, 358, 464 A.2d 795 (1983); Miller v. Appleby, 183 Conn. 51, 55, 438 A.2d 811 (1981)." McClintock v. Rivard, [ CT Page 2458 219 Conn. 417, 427.] "[Our Supreme Court] has long recognized liability for negligent misrepresentation. . . . [It has] held that even an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth.' Richard v. A. Waldman Sons, Inc., 155 Conn. 343, 346, 232 A.2d 307
(1967). . . ." (Citations omitted.) D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, 202 Conn. 206, 217, 520 A.2d 217 (1987). . . .
 "[T]he plaintiff need not prove that the representations made by the [defendant] were promissory. It is sufficient . . . that the representations contained false information." D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, supra, 202 conn. 218.
Based on the aforementioned case law, the court concludes that Taylor Oil is liable for negligent misrepresentation to the plaintiff.
Again the more credible testimony and evidence leads the court to conclude that Taylor Oil, through its representative, Tom Taylor, knew that the Lipshies had a prospective purchaser for their Millerton Road property. Taylor knew the sale was contingent on removal of the underground oil tank, clean up of the site, and installing a new oil tank in the cottage.
Neither Taylor nor any of its representatives notified the Lipshies that the oil tank removed was a "leaker". Nor did they notify the Lipshies that oil contamination was found in the tank grave. Nor did they advise the Lipshies that DEP had been notified by Mr. Titting, the Town of Salisbury Building Inspector. Nor did they advise the Lipshies that the new tank installed was not approved by Mr. Fitting due to it being installed too close to the burner and not having been air tested in his presence. Instead, the Lipshies were advised that everything went fine. This was obviously a misrepresentation as Taylor Oil had the means of knowing and the duty of communicating the truth.
In addition, the court finds it difficult to believe Taylor Oil's assertion that the parties had agreed to installing the new oil tank in violation of Code. Why would a company in the fuel oil business for many years as testified to by Mr. Taylor go along with the idea of installing an oil tank in violation of Code. The court concludes that a reputable business would not engage in such activity. CT Page 2459
Based on the court's findings and conclusions, the court must determine what damages to award.
The court looks to the precedent in Rejouis v. Greenwich Taxi, Inc.,57 Conn. App. 778, 784 (2000) for guidance:
 "There are no unbending rules as to the evidence by which [damages for breach of contract] are to be determined. . . . The general rule in breach of contract cases is that the award of damages is designed to place the injured party, so far as can be done by money, in the same position as that which he would have been in had the contract been performed. . . . In making its assessment of damages for breach of [any] contract the trier must determine the existence and extent of any deficiency and then calculate its loss to the injured party." (Citation omitted; internal quotation marks omitted.) L.F. Pace Sons, Inc. v. Travelers Indemnity Co., 9 Conn. App. 30, 41, 514 A.2d 766, cert. denied, 201 Conn. 811, 516 A.2d 886
(1986).
The court finds that the following damages are supported by the evidence:
1) The plaintiff did have to hire another company, Lindell Fuels, Inc., to remove the oil tank that had been installed in violation of Code by Taylor Oil and to install a new oil tank that would not be in violation of Code. The cost, as indicated in Exhibit 8 was $3,900. This amount is awarded to the plaintiff as damages.
2) The plaintiff had a real estate contract with Ms. Bostrom to sell the property for $700,000 by March 31, 1997. This transaction did not close. Taylor Oil, by breaching its contractual obligations to the plaintiff and then negligently misrepresenting the result of its work to the plaintiff, caused this transaction not to close. The plaintiff did eventually sell the property to the Littauers by February, 1999. The sale price was $568,000. These figures are substantiated by exhibits one, two, nine and ten. The difference, or the lost benefit of the bargain, to the plaintiff was $132,000. The court awards this amount to the plaintiff as damages.
3) The additional claim of the plaintiff to be awarded damages for carrying costs of the property were not substantiated by any evidence by the plaintiff. Therefore, the court does not award any damages for this claim. CT Page 2460
Conclusion
The court enters judgment for the plaintiff in the total amount of $135,900. Appropriate costs will be imposed by the court upon submission of a verified Bill of Costs by the plaintiff Judgment enters accordingly.
AGATI, JUDGE.