UPDIKE, KELLY AND SPELLACY, P.C. *v.* STEWART
W. BECKETT, JR., ET AL.
(SC 16947)
(SC 16948)
(SC 16949)

Sullivan, C. J., and Norcott, Katz, Palmer and Vertefeuille, Js.

614

Argued January 7—officially released June 15, 2004

*Leon M. Rosenblatt*, for the appellants-appellees (defendants).

*Jeffrey L. Williams*, with whom were *Barbara A. Frederick* and, on the brief, *Michael J. Byrne*, for the appellee-appellant (plaintiff).

*Opinion*

SULLIVAN, C. J. These appeals arise from an action filed by the plaintiff, Updike, Kelly & Spellacy, P.C., a law firm, against the defendants,[1] former airline pilots, seeking to recover legal fees incurred in representing the defendants in three cases. The plaintiff's third amended revised complaint alleged breach of contract (count one) and sought damages in quantum meruit (count two). The defendants filed a five count counterclaim seeking disgorgement of excessive legal fees (count one) and alleging legal malpractice (count two), intentional misrepresentation (count three), violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. (count four), and negligent misrepresentation (count five).[2] The trial

---

[1] The plaintiff named 105 individual defendants in its third amended revised complaint. Ultimately, the plaintiff did not serve, settled with or withdrew its claims against thirty-two of those defendants. It proceeded to judgment against sixty-seven of the defendants. The disposition of the claims against the remaining six defendants is unclear from the record. The following defendants are parties to these consolidated appeals: Raymond Albers II; Gary K. Armstrong; Donald Arneson; W. Schafer Bean; Stewart Beckett, Jr.; Samuel A. Belcher; William H. Benefield; Vidmantas Bliumfeldas; Rudolph E. Brabenec; Dallas E. Butler; James Canitz; Gerald W. Cassidy; Thomas Ceranic; David M. Criley; Donald E. Dale, Jr.; Donato D'Angelico; Thomas Ebbert; Keith Erlewine; Robert K. Frank; Alto Furlong, Jr.; Paul R. Hakim; Robert Harrell; Albert Harrison; William H. Hart; Reginald W. Havill; Bernard Hladik; Norman R. Hosking; Austin Joyner; Terrance J. Kane; Kenneth E. Lemming; Byron Lewin; Manuel J. Lewis; Keith Mackey; Kenneth G. McAdams; Robert C. McGrory; Jan Menke; Bruce P. Murphy; John R. Neff; William A. Pitsker; Terry W. Pope; Frank C. Rice; Stanley A. Roitz; Carl Schmeusser; Harry E. Shepard; Donald Shotz; William M. Shuster; Conrad E. Smith; Edward Spellacy, Jr.; Michael N. Stafford; William A. Stevens; John S. Wentworth; John L. White; Jon N. Zoller.

[2] The defendants also raised the following special defenses to the plaintiff's claims: (1) the plaintiff's claims were barred in whole or in part by the statute of limitations; (2) the plaintiff's claims were barred in whole or in part by the doctrine of laches; (3) as a matter of law, the plaintiff did not act as an attorney for some or all of the defendants; (4) any agreement upon

court directed a verdict against the defendants on counts one, two, three and five of their counterclaim. The parties agreed that the fourth count of the counterclaim alleging CUTPA violations would be decided by the court. The court also directed a partial judgment for the plaintiff on count one of its third amended revised complaint alleging breach of contract. The court instructed the jury that the only issues that it was required to determine were (1) whether the plaintiff was entitled to certain fees for nonattorney time and disbursements pursuant to the contract or under a theory of quantum meruit and (2) whether the defendants owed the damages jointly and severally or severally only. The jury determined that the plaintiff was not entitled to charge fees for nonattorneys but that it was entitled to recover for disbursements. It found damages in the amount of $596,324.28. The jury also found that the damages were not owed jointly and severally, but severally only.

After granting the plaintiff's motion for award of interest in the amount of $267,447.92, the trial court rendered judgment for the plaintiff in the amount of $863,772.12. Thereafter, the court clarified that judgment had

which the plaintiff's claims are based is void as a matter of public policy and/or violative of the rules of professional conduct as it applies to some or all of the defendants; (5) any fee-splitting or other agreement there might have been between or among the plaintiff and the defendants' other attorneys did not create obligations on the part of the defendants, did not bind some or all of the defendants, and is void as a matter of law; (6) the plaintiff's fees were excessive and unreasonable; (7) the plaintiff had already been paid all money to which it was entitled; (8) the plaintiff had already been paid more money than it was entitled to receive under the law; (9) the plaintiff collected money from all of the defendants on a contingency basis but did not have a written or otherwise proper contingency agreement with them; (10) none of the defendants had a fee agreement with the plaintiff; (11) the plaintiff failed to supply an accurate estimate of fees and failed adequately to revise its earlier estimates; (12) the plaintiff improperly charged for nonattorney time and for nonpartner time; and (13) the plaintiff failed to communicate adequately with some or all of the defendants regarding claimed fees.

entered against each defendant separately in the amount of $13,087.46 and rendered judgment for the plaintiff on the defendants' CUTPA claim. The defendants then filed these appeals,[3] raising numerous challenges to the trial court's rulings. The plaintiff cross appealed claiming that the trial court improperly had: (1) submitted the issue of several liability to the jury; and (2) allowed the defendants' expert witness to instruct the jury on the nature of fiduciary duty. We conclude that the trial court improperly directed a partial verdict for the plaintiff on the plaintiff's breach of contract claim. We also conclude that the trial court improperly directed a verdict for the plaintiff on the defendants' claims of negligent and intentional misrepresentation and breach of fiduciary duty. Finally, we conclude that the trial court improperly rendered judgment for the plaintiff on the defendants' counterclaim alleging a violation of CUTPA. Accordingly, we reverse the judgment.

Evidence of the following relevant facts was presented at trial. The defendants are airline pilots who formerly were employed by Pan American World Airways, Inc. (Pan Am). In 1991, Pan Am filed a bankruptcy plan under which Delta Air Lines, Inc. (Delta), was to purchase many of its assets and fund a successor entity, Pan Am II. The plan also provided that some Pan Am pilots would transfer to Delta and others would work for Pan Am II. Several pilots became concerned that their union representatives in the Air Line Pilots Association (union) were not adequately protecting their rights in the transfer process. A group of the pilots, including the defendants Stewart W. Beckett, Jr., and

---

[3] The named defendant et al., Gary K. Armstrong et al., and James Canitz et al., filed three separate appeals with the Appellate Court. The appeals subsequently were consolidated and we transferred the consolidated appeals to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

Edward Spellacy, formed a Concerned Pilots Committee (committee) and authorized Beckett to retain counsel to protect their interests.

Stewart Beckett first discussed the pilots'[4] concerns with his daughter, Suzann Beckett, an attorney with the law firm of Eisenberg, Anderson, Michalik and Lynch. Suzann Beckett's firm could not handle the case, so she referred the matter to Scott Karsten, an attorney with the law firm of Sack, Spector and Barrett. On August 29, 1991, Stewart Beckett sent a memo to the pilots stating that the committee anticipated taking legal action against the union and Pan Am and that Karsten had been retained to represent the committee in those matters. The memo also invited the pilots to join in the actions and to contribute to a legal expense fund.

On November 26, 1991, Karsten wrote to Stewart Beckett to memorialize the fee arrangements for the anticipated litigation. He informed Beckett that he anticipated bringing two actions, one against the union and one against Pan Am or Delta, or both. The letter indicated that Karsten's firm intended "to conduct these proceedings from initiation through trial, if necessary, on behalf of all persons in your group who indicate by countersigning this letter their desire to participate." It also stated that, "[i]n view of the uncertainties of recovery in this type of litigation, the need to devote substantial resources to its proper prosecution and the likely duration and complexity of the proceedings," the firm would neither charge its full hourly rate nor expect a contingency fee of one third of the ultimate recovery. Instead, the firm would "reduce [Karsten's] 1991 usual hourly rate of $175 to $100 per hour, with annual increases . . . in the amount of $10 per hour." In addi-

---

[4] Throughout this opinion, we use the word "pilots" broadly to refer to all of the pilots who participated in any way in pursuing the claims against the union, Pan Am or Delta, including, but not limited to, the defendants.

tion, the firm would receive 20 percent of any gross recovery as a contingency fee. The letter also stated that "[i]n the event of affiliation with other counsel, as in connection with the age discrimination claim, these fee arrangements will be the objective . . . ."[5] The following language appeared at the bottom of the last page of the letter: "I agree to participate in litigation against [the union], Delta Airlines and Pan American World Airways, under the terms and conditions set forth in this letter." The language was followed by date and signature lines. Stewart Beckett testified at trial that he forwarded copies of the retainer letter to the other pilots. Karsten testified that every defendant in the present case signed a copy of the letter. Several pilots who signed copies of the letter indicated on the copies that their involvement in the litigation would be limited to a specific dollar amount.[6]

During late 1991, Karsten had discussions with a number of law firms about the possibility of working with him on the pilot litigation. In December, 1991, Karsten and Suzann Beckett met with Thomas Shortell, the head of the plaintiff's litigation department, to discuss the plaintiff's potential involvement in the case. Suzann Beckett testified that Shortell assured her that he and one of his partners, Debra Neubert, would be primarily responsible for handling the case and "there would not

---

[5] The lower right hand corners of all of the copies of this letter in the record, including the original trial exhibit, were cut off during the copying process. The ellipses in the following quote indicate the location of the missing text: "In the event of affiliati . . . with other counsel, as in connection with the age discriminat . . . claim, these fee arrangements will be the objective as well . . . participants will, as is customary, remain responsible for . . . incurred during the course of the litigation."

[6] John L. White wrote at the bottom of his copy: "I reserve the right to discontinue my participation after I have contributed a total of $1,500." Jerome P. Fox wrote at the bottom of his copy: "After an initial cost of $2,000 I reserve the right to reconsider my participation." John S. Wentworth wrote at the bottom of his copy: "I request to review my position after expenditures reach $2,500."

be heavy use or really any use of associates." She also testified that Shortell had "specifically agreed that paralegals would not be charged."[7] Karsten testified, however, that he chose the plaintiff to work on the case because the firm had a large staff of associate attorneys to handle the work. He also testified that he had informed Stewart Beckett that paralegals would be charged at a lower hourly rate than associates.

There was another meeting at the plaintiff's offices later in December, 1991. Karsten, Stewart Beckett, Spellacy, Shortell, Neubert and Suzann Beckett attended. Suzann Beckett testified that Neubert stated at the meeting that she thought that the litigation would cost approximately $400,000. Shortell indicated that he thought, on the basis of his extensive experience, that the costs would be between $200,000 and $400,000. The meeting participants discussed the fact that approximately 100 pilots would participate in the actions. Suzann Beckett also testified that Shortell assured Stewart Beckett that, if each pilot paid $500 twice annually for the three to four years that the litigation would probably take, that would cover the costs of litigation. Stewart Beckett testified that although they discussed the possibility that each pilot would contribute $4000, Shortell did not say anything at the meeting about how the money was going to be assessed or who would be responsible for paying the plaintiff's fees. He also testified that 164 pilots participated in the actions at one time or another.

On December 30, 1991, Karsten wrote to Shortell to propose a course of action. He indicated that approximately fifty-five pilots had responded to his November 26, 1991 retainer letter and had agreed to the fee

---

[7] Suzann Beckett did not testify as to when Shortell made this representation. The defendants indicate in their brief that the representation was made at the December, 1991 meeting.

arrangement discussed therein.[8] Karsten noted that there were four possible causes of action, including breach of the duty of fair representation, age discrimination, breach of contract and a shareholders' derivative action. He stated: "I believe we are agreed, that whichever of our two firms performs work during the preparation of this litigation will be compensated at [$100 per hour with an annual $10 increase]." He also proposed splitting the 20 percent contingency fee on all claims except the duty of fair representation claim as follows: 12 percent to the plaintiff, 6 percent to Karsten's law firm and 2 percent to Suzann Beckett. With respect to the duty of fair representation claim, he proposed splitting the fee as follows: 9 percent to the plaintiff, 9 percent to Karsten's firm and 2 percent to Suzann Beckett. Karsten testified at trial that, as of the date of his letter to Shortell, he had not discussed the plaintiff's potential involvement in the case with any of the defendants except Stewart Beckett and Spellacy.

On January 7, 1992, the plaintiff sent a letter agreement to Karsten and Suzann Beckett summarizing the terms of their involvement in the pilots' cases. The letter stated: "It is our understanding that, as of this date, you have signed retainer letters with approximately 55 pilots agreeing to an hourly rate of $100, with annual increments of $10.00, plus a 20% contingency fee."[9] It further indicated that Karsten and Suzann Beck-

---

[8] The record contains signed agreements from approximately sixty-six of the defendants. The precise number of pilots who signed the agreements cannot be ascertained because the signatures are not clear and it appears that some pilots may have executed more than one agreement. Approximately thirty-four of the agreements in the record were signed before December 30, 1991.

[9] Karsten and Suzann Beckett ultimately entered into a side agreement whereby Karsten was to receive 4.5 percent of any contingency fee not related to the duty of fair representation claim and Suzann Beckett was to receive 3.5 percent of the fee. With respect to the duty of fair representation claim, Karsten was to receive 7 percent of the fee and Suzann Beckett was to receive 1 percent.

ett had "agreed to assist [the plaintiff] in obtaining any reasonably necessary documentation from the pilots to establish our relationship consistent with the retainer letters." Finally, it indicated that the agreement "is conditioned upon the establishment and maintenance of a fund by the pilots for payment of all reasonable fees and disbursements, to be billed and paid on a monthly basis. Suzann Beckett will continue to hold these funds. Itemized statements will be forwarded to her for payment, which statements will include specification of the time, attorney and work performed." The letter agreement was signed by Karsten and Suzann Beckett.

On January 22, 1992, the plaintiff and Karsten filed in the United States District Court for the District of Connecticut, on behalf of the pilots, a complaint against the union alleging breach of the duty of fair representation. One week later, on January 29, Karsten sent a letter to all of the pilots who had signed the retainer agreement advising them that the complaint had been filed and enclosing a copy of the complaint. Karsten stated in the letter that "the present legal landscape presents significant obstacles to the successful maintenance of a [duty of fair representation] suit." He also stated that the upcoming discovery process was likely to be "time consuming and sometimes tedious . . . ." He advised the pilots that his law firm had "associated with [the plaintiff] to pursue this litigation" and that "Shortell and his people will be working closely with us as we go along, and will provide invaluable assistance and resources." Finally, he stated, "[t]he opening shots in this battle have just been fired, and the outcome is uncertain." Subsequently, the pilots brought two additional actions—a third party contract action against Delta and an age discrimination action against Delta.

Over the course of the next year, the plaintiff submitted bills in the amount of $22,285.40 for January, 1992; $22,406.93 for February, 1992; $57,503.41 for March,

April and May, 1992; $7268.20 for June, 1992; $47,187.28 for July, August and September, 1992; $18,098.61 for October, 1992; and $25,879.76 for November, 1992. As provided in the January 7, 1992 letter agreement, Suzann Beckett was responsible for reviewing the bills and paying them out of funds received from the pilots. She testified that she complained repeatedly to Shortell about the following concerns: the pilots were being billed for services rendered before the plaintiff had formally affiliated with Karsten; Shortell was not doing the work himself; the pilots were being charged for paralegal work; large blocks of time were being billed for attorney conferences; time was being billed to perform research that had already been done; and nonreimbursable disbursements were being charged. Suzann Beckett testified that Shortell initially indicated that the pilots would be credited for these items. Because the bills did not show the balances owed on previous bills, however, she was unable to verify that he had done so. She was unable to find in her records any written documentation concerning the credits. Barbara Wagner, a partner with the plaintiff who handled many of Suzann Beckett's inquiries concerning the bills, testified that Beckett had never raised questions with her about the billing of paralegal time.

On December 31, 1992, Stewart Beckett met with Shortell to discuss the progress of the case and the billing situation. Shortly after the meeting, Stewart Beckett wrote to Shortell to "review [the] understanding" reached at the meeting and "to prevent any future misunderstandings." He stated in the letter that the plaintiff was to provide the pilots with "a proposed budget with a maximum high dollar value not to exceed $400,000 . . . in total legal fees and expenditures." In a letter dated January 14, 1993, Shortell responded that "at no time did we place a cap of $400,000 on our legal fees." Copies of the letter were sent to Suzann Beckett,

Karsten and Spellacy. There is no evidence in the record that anyone ever responded to Shortell's letter.

Disputes over the bills continued into 1993. Suzann Beckett paid $5000 toward the $5954.58 January, 1993 bill, she paid the $11,370.01 February, 1993 bill in full, and she paid $11,353.10 toward the $15,520 March, 1993 bill. In a letter to Suzann Beckett dated May 27, 1993, Wagner indicated that the plaintiff did "not accept any of your conclusions regarding the portion of the [March] bill which you have unilaterally decided not to pay." Wagner also indicated that she had scheduled a meeting with Stewart Beckett to discuss outstanding bills and invited Suzann Beckett to attend. Finally, Wagner indicated that, at the request of Stewart Beckett, all work on the case had ceased.

Shortell, Karsten, Suzann Beckett and Stewart Beckett met on June 16, 1993. On June 17, 1993, Wagner wrote to Suzann Beckett and Karsten and indicated that, pursuant to the agreement reached at the meeting, Karsten and Shortell were to meet before June 30 to identify all disputed items on the bills. Payment for any items that were not identified as disputed would be due in full. Wagner also wrote that the plaintiff had "been directed to forward our statements in the future to [Spellacy] and will deal directly with [Spellacy] and [Stewart Beckett] with regard thereto."

Suzann Beckett testified that, in approximately June or July, 1993, Shortell had become angry at her continual questioning of the bills and told her that the pilots were going to have to choose between her and the plaintiff. Stewart Beckett testified that Shortell had made similar comments to him. Subsequently, Suzann Beckett received a telephone call from Wagner instructing her to transfer the pilots' funds into an account that Wagner had opened. Suzann Beckett vehemently protested this instruction. Ultimately, however,

she received a letter from her father informing her that Spellacy would be handling the pilots' legal fund in the future.

In a letter to Spellacy dated October 25, 1993, Suzann Beckett confirmed that the funds had been transferred to the new account under Spellacy's control. She also indicated that neither Sack, Spector and Barrett nor the plaintiff had been paid "this month" and requested that Spellacy "make payment to them at your earliest convenience." She enclosed all of the plaintiff's bills from August 1, 1992, through September 30, 1993, and directed Spellacy to pay the bills "out of settlement or verdict if these bills have not been paid in full at that time."

Meanwhile, on August 9, 1993, Stewart Beckett had written to Shortell to solicit the plaintiff's help in collecting overdue contributions to the pilots' legal fund. He wrote: "A very positive and forceful reminder from the firm, along with a cohesive collection policy should bring about the desired result. . . . If you agree, please let me know. We can then double check our lists and you can start the process of collection. Funds collected would go directly into reducing the [plaintiff's] bill."

On October 28, 1993, the plaintiff sent the following collection letters to the pilots: "Approximately 140 pilots joined together and committed themselves to bring these actions against [the union] and Delta, and, like yourself, signed agreements to be responsible for the payment of attorney's fees and disbursements on a periodic basis throughout the litigation. Obviously, to the extent that you have not paid your share, it automatically affects the entire group."

By September, 1994, both the plaintiff and the pilots had become very concerned about the amount of the unpaid bills. Karsten testified that on September 30, 1994, he met with Shortell, Wagner, Suzann Beckett and

either Stewart Beckett or Spellacy, or possibly both pilots, to discuss whether the plaintiff would continue to represent the pilots and which pilots would continue to be involved in the litigation. At the meeting, the pilots agreed that the plaintiff would continue to represent them. Karsten testified that the issue of how the bills would be paid was not entirely resolved at the meeting, but that there was an agreement that "there would be a concerted effort to collect what was outstanding" from pilots who were in arrears in their payments to the fund. In furtherance of that agreement, the plaintiff drafted collection letters to those pilots. Spellacy provided the plaintiff with information concerning the amount that each pilot owed. The plaintiff sent the draft letters to Karsten, who revised them and returned them to the plaintiff. Karsten testified that the plaintiff, with his permission, sent the letters to the pilots on his firm's letterhead and under his signature.

Stewart Beckett testified that the last time the pilots were asked to contribute to the fund was in August, 1995. He testified that no further assessments were made because, at that point, the pilots had contributed slightly over $400,000 to the fund, which "we felt was the controlling number."[10]

At some point in 1995, the contract action against Delta was settled for $250,000. Spellacy, Stewart Beckett and Shortell agreed that $30,000 of the $50,000 con-

---

[10] Stewart Beckett testified that the pilots were not assessed after August, 1995. When the defendants' attorney attempted to ask why no assessment was done after that, the plaintiff's attorney objected on the ground of relevance. The trial court overruled the objection. Stewart Beckett testified that the committee members had stopped making assessments because they had collected over $400,000 and that they felt that they had a contract for that amount. The plaintiff's attorney then requested that the testimony pertaining to the contract be stricken and the trial court granted the request. It does not appear, however, that the trial court intended to strike Stewart Beckett's testimony that assessments had ceased after contributions reached approximately $400,000.

tingency fee, which represented 20 percent of the settlement, would go to the plaintiff and the remaining $20,000 would be divided between Karsten and Suzann Beckett. They agreed to give $30,000 to Suzann Beckett for outstanding hourly fees and the remaining $170,000 to the plaintiff "to be applied against outstanding fees." The agreement also provided that the plaintiff would establish an escrow account in the amount of $20,000 to pay future expenses in the action against the union. Suzann Beckett testified that Shortell told her that the settlement funds would cover the plaintiff's expenses through trial of the action against the union and that no additional fees would be owed unless the trial judge awarded attorney's fees in that case. Each of the defendants authorized the disbursement agreement.

The duty of fair representation case went to trial in the United States District Court for the Eastern District of New York in June, 1996. Stewart Beckett, Spellacy and Frank C. Rice, another pilot, testified that, during the trial, each of them had expressed concern to Shortell over the mounting legal bills and the pilots' ability to pay them. They testified that Shortell told them not to worry about the bills. Rice testified that Shortell told him that the unpaid fees, which were approaching $1,000,000, had been inflated for purposes of obtaining an award of attorney's fees if the pilots prevailed at trial and that the pilots would not have to pay them. On June 21, 1996, however, Shortell sent a letter to Stewart Beckett in which he wrote, "in the event of a settlement, depending on the amount, I am willing to discuss our outstanding fees. However, in the event of a favorable or unfavorable verdict, there has been no discussion regarding the waiver of our outstanding fees. Rather, to the contrary, it is our expectation that these fees will be paid."

On June 28, 1996, the jury rendered a verdict in favor of 88 of the 109 plaintiffs in the liability phase of the duty

of fair representation case. At that point, the presiding judge recommended that the case be settled for $35 million to $40 million and referred the case to mediation. The pilots made a settlement offer of $49 million, but ultimately decided the case was worth closer to $200 million and withdrew the offer. The union filed a motion for judgment notwithstanding the verdict, however, which the trial court granted. At that point, Shortell recommended making a settlement offer of $40 million. The pilots rejected the recommendation and decided instead to appeal from the trial court's ruling on the union's motion for judgment notwithstanding the verdict. The judgment was affirmed on appeal. See *Spellacy* v. *Airline Pilots Assn.-International*, 156 F.3d 120 (2d Cir. 1998), cert. denied, 526 U.S. 1017, 119 S. Ct. 1251, 143 L. Ed. 2d 348 (1999).

Meanwhile, the plaintiff and Karsten had drafted an agreement to be executed by each of the pilots who had participated in the duty of fair representation case. The agreement provided that, if each pilot who had not prevailed at the liability phase agreed to waive an appeal, a portion of any damages recovered in the action would be apportioned to those pilots. The agreement also provided that "each of the 109 plaintiffs in the [duty of fair representation] litigation remains obligated to pay his share of attorney's fees and expenses, including past and future assessments by the Pilots Legal Fund, as agreed to previously, and that this obligation is unaffected by this agreement."

Almost immediately after the trial court had granted the union's motion for judgment in the duty of fair representation case, the age discrimination action against Delta was transferred to New York counsel. The trial court ultimately rendered summary judgment in favor of Delta in that case, which was affirmed on appeal. See *Criley* v. *Delta Air Lines, Inc.*, 119 F.3d

102 (2d Cir.), cert. denied, 522 U.S. 1028, 118 S. Ct. 626, 139 L. Ed. 2d 607 (1997).

During the course of the various actions, the plaintiff communicated directly with several of the defendants concerning discovery matters. It also defended the depositions of several defendants. In addition, Stewart Beckett and Spellacy wrote at least four times to the pilots and apprised them of some the plaintiff's activities.

The plaintiff's administrator in charge of billing records, Deneen Seifel, testified that, ultimately, the plaintiff's bills to the pilots amounted to $1,383,913.16. The plaintiff was paid $468,088.07, leaving unpaid bills in the amount of $915,825.09.

On January 1, 1999, the plaintiff brought this action against the defendants alleging breach of contract and, in the alternative, seeking recovery in quantum meruit. The defendants filed a counterclaim seeking disgorgement of excessive fees and alleging malpractice, negligent and intentional misrepresentation and CUTPA violations. As we have noted, the only issues that went to the jury were whether the plaintiff was entitled to paralegal fees and disbursements under the contract or in quantum meruit and, if so, the dollar amount to which it was entitled, and whether the defendants' debt to the plaintiff was joint and several or several only.[11] The

---

[11] The trial court instructed the jury that the plaintiff was entitled to reasonable attorney's fees as a matter of law and that all of the plaintiff's bills were reasonable because the defendants failed to present expert testimony that the bills were unreasonable. The plaintiff and the defendants apparently disagreed, however, as to what portion of the bills constituted attorney's fees. The court instructed the jury that the plaintiff claimed that it was owed $647,819.66 for attorney's fees, $167,242.05 for nonattorney fees and $28,923.70 in disbursements for a total of $843,785.41. Our calculations show, however, that these amounts total $843,985.41. The reason for this discrepancy is not clear. The court also instructed the jury that the defendants claimed that bills reflected $470,861.50 in attorney's fees, $277,423.50 in nonattorney fees and $28,923.70 in disbursements for a total of $777,208.70. The reason for the discrepancy between the amounts claimed by the plaintiff

jury found that the plaintiff was owed $567,400.58 in attorney's fees and $28,923.70 in disbursements for total damages of $596,324.28. The jury also found that the plaintiff was not entitled to paralegal fees and that the damages were not owed jointly and severally, but severally only.

After the verdict, the defendants filed a motion for remittitur and to set aside the verdict as excessive. The plaintiff filed a motion to set aside the verdict and for judgment notwithstanding the verdict with regard to the jury's verdict on joint and several liability. The plaintiff also filed a motion for an award of interest. The trial court denied the defendants' motion and the plaintiff's motion to set aside the verdict on joint and several liability, granted the motion for award of interest in the amount of $267,447.92 and rendered judgment in the amount of $863,772.12. The plaintiff then filed a motion for clarification of the dollar amount of the judgment rendered against each separate defendant. The court granted the motion for clarification, calculated that each pilot owed $13,087.46 by dividing the total amount of the judgment by the sixty-six defendants remaining in the case, and rendered an amended judgment accordingly. These appeals followed.

The defendants claim on appeal that the trial court improperly: (1) directed a partial verdict for the plaintiff on the breach of contract count; (2) failed to instruct the jury that it could determine damages on the basis of an hourly rate lower than the rate charged by the plaintiff; (3) determined the amount of damages owed by each separate defendant; (4) awarded prejudgment interest to the plaintiff; (5) directed verdicts for the

and those claimed by the defendants is also not clear. Nor is the reason clear for the discrepancy between both claims and Seifel's testimony that the plaintiff was owed $915,825.09 in outstanding fees. In any event, the trial court instructed the jury that it was to calculate the amounts owed on the basis of the bills that were introduced as exhibits.

plaintiff on the defendants' counterclaims for negligent and intentional misrepresentation; (6) directed a verdict for the plaintiff on the defendants' counterclaim for legal malpractice; and (7) rendered judgment for the plaintiff on the defendants' CUTPA counterclaim. On the cross appeals, the plaintiff claims that the trial court improperly: (1) submitted the issue of whether the defendants were jointly and severally liable or only severally liable to the jury; (2) allowed the defendants' expert witness to instruct the jury on the nature of the plaintiff's fiduciary duty to the defendants; and (3) submitted the issue of whether the plaintiff was entitled to charge for nonattorney fees to the jury. We conclude that the trial court improperly directed a verdict for the plaintiff on its breach of contract claim and on the defendants' claims for negligent and intentional misrepresentation and breach of fiduciary duty. We further conclude that the trial court improperly found for the plaintiff on the defendants' CUTPA counterclaim. Accordingly, we reverse the judgment. Because these issues are dispositive, we do not reach the remaining claims raised by the defendants on appeal. We address the claims raised by the plaintiff in the cross appeals, however, because they are likely to arise on retrial. We reject each of the claims on the plaintiff's cross appeals.

I

We first address the defendants' claim that the trial court improperly directed a partial verdict for the plaintiff on its breach of contract claim. We conclude that there was sufficient evidence for the jury reasonably to have found that a contract between the plaintiff and the defendants did not exist. Accordingly, we reverse the trial court's ruling.

The following additional procedural history is relevant to our resolution of this issue. During trial, the court ruled from the bench that "once it is admitted,

which it has been in my view, that Mr. Karsten was the attorney for all these pilots, he as a matter of law had the authority to enter into this particular contract [i.e., the January 7, 1992 letter agreement].[12] . . . [T]his contract with [the plaintiff] was directly related, and, in fact, mentioned in the retainer agreement [i.e., the November 26, 1991 retainer letter][13] with the pilots. . . . The law in Connecticut is [that] the attorney-client relationship is an agency relationship."[14] The court did not cite any specific legal authority for its conclusions, but indicated that it had reviewed the Restatement (Second) on Agency.

The court later instructed the jury that it was required to find that the January 7, 1992 letter agreement constituted a contract between the plaintiff and the defendants, that the plaintiff had complied with the terms of the contract, and that all amounts charged for attorney's fees and disbursements covered by the contract were

---

[12] The trial court also stated elsewhere on the record that "the attorney-client relation is an agency relationship in Connecticut. Clearly an attorney has a right to contract with another attorney on behalf of his client. . . . Karsten had actual and apparent authority from [the plaintiff's] point of view to contract on behalf of the pilots."

[13] The court apparently was referring to the reference in the November 26, 1991 letter to the potential "affiliation with other counsel."

[14] It is not clear from the record what the trial court was ruling on when it issued this ruling. The record does not contain a motion for a directed verdict on count one of the plaintiff's complaint. The plaintiff did file a motion in limine seeking to prevent the defendants' expert witness, William Clendenen, an attorney, from testifying on the legal question of whether there was a valid and enforceable agreement between the plaintiff and the defendants. The plaintiff argued that the validity of the agreement was a legal question for the court to decide. The defendants objected on the ground that whether Karsten or Suzann Beckett were agents of the defendants authorized to enter into an agreement with the plaintiff presented a question of fact for the jury. We assume for the purposes of this opinion that the trial court was ruling on this question. Cf. *Kelsey* v. *Connecticut State Employees Assn.*, 179 Conn. 606, 609 n.3, 427 A.2d 420 (1980) (rejecting claim that proper motion for directed verdict had not been before trial court and treating combined "motion for partial directed verdict" and request to charge as motion for directed verdict).

reasonable and were due and owing to the plaintiff. The court also instructed the jury that it was required to determine whether the contract covered paralegal and other nonattorney fees and which disbursements were covered by the contract language, "reasonable fees and disbursements."[15]

The defendants claim on appeal that the jury reasonably could have determined that Karsten did not have authority to bind the defendants to a contract with the plaintiff.[16] We agree.

Before reviewing the law governing the defendants' claim, we set forth the proper standard of review. "A directed verdict is justified if on the evidence the jury could not reasonably and legally have reached any other conclusion. . . . In reviewing the trial court's action in directing a verdict for [the moving party], we must consider the evidence in the light most favorable to the [nonmoving party]." (Citations omitted; internal quotation marks omitted.) *Berry* v. *Loiseau*, 223 Conn. 786, 819–20, 614 A.2d 414 (1992); see also *Kelsey* v. *Connecticut State Employees Assn.*, 179 Conn. 606, 614–15, 427 A.2d 420 (1980) (directed verdict for plaintiff was appropriate when "evidence is such that the minds of fair and reasonable persons could reach but one conclusion").

[15] It is not clear to us how the trial court's instruction that the jury must find that all disbursements covered by the contract were reasonable can be reconciled with its instruction that the jury must determine which disbursements were reasonable and therefore covered by the contract. Because this issue was not raised on appeal, we need not resolve it.

[16] The plaintiff argued during oral argument before this court that the defendants' claims were waived because counsel for the defendants had indicated to the trial court that he did not contest the court's ruling that Karsten had authority to bind the defendants. We reject this claim. Counsel for the defendants stated to the trial court during arguments on whether Karsten's agreement with the plaintiff was illegal per se that he was not "contesting [the court's ruling that Karsten had authority] *right now*." (Emphasis added.) We do not believe that this statement, taken in context, constituted a waiver of the defendants' right to contest the ruling at any time.

We now turn to the governing law of agency. "It is elementary law that an attorney in a particular case has no general authority, by virtue of his retainer, to employ other counsel, either by way of substitution or as assistant or associate counsel, at the expense of his client. But where the employment of the original attorney is general in its character, and amounts to an agency in the legal business of his client, or where the authority or the subsequent assent on the part of the client to the employment of additional counsel can fairly be inferred from the facts of the case, the client will be bound by such employment. . . . If the attorney, who has the management of the suit, employ[s] an assistant at the trial, and the client is present, and sees the person, thus employed, assist in managing and conducting the suit, the inference would be strong, if not irresistible, that he consented to such employment, and he would be liable for the fees of the assisting counsel. . . . Where an attorney employs counsel, it is a question of fact whether he did not become personally liable for his fees, although for the benefit of his client. But if the client be present at the trial he is liable for the services of counsel, although there was a secret agreement by the attorney that he would pay for them." (Citations omitted; internal quotation marks omitted.) *Rowell* v. *Ross*, 91 Conn. 702, 705–706, 101 A. 333 (1917).[17]

---

[17] The defendants claim that it violates public policy per se for an attorney to hire another attorney on behalf of a client. In support of this proposition they rely on the principle that contracts that are personal in nature "ordinarily cannot be delegated even to a competent substitute without the express or implied authority of the principal." *Knudsen* v. *Torrington Co.*, 254 F.2d 283, 286 (2d Cir. 1958). The issue in the present case, however, is precisely whether Karsten had the express or implied authority to bind the defendants contractually to the plaintiff, within the meaning of *Rowell* v. *Ross*, supra, 91 Conn. 702. It is not disputed that, in the absence of any such authority, the defendants could not be bound. Accordingly, we reject this claim.

For similar reasons we reject the defendants' claim that a determination that Karsten was authorized to bind them contractually to the plaintiff would constitute an "end run" around rule 1.5 (b) and (c) of the Rules of Professional Conduct (1992). Rule 1.5 (b) provides in relevant part: "When

These principles governing the scope of an attorney's authority to enter into a contract with other legal counsel on behalf of his client are consistent with general agency principles. In *E. Paul Kovacs & Co.* v. *Alpert*, 180 Conn. 120, 125, 429 A.2d 829 (1980), we stated that, "[a]s a general rule, a principal may be bound to contracts executed by an agent if it is within the agent's authority to contract on behalf of that principal . . . and the authority to enter into a specified contract includes the authority to make it in the usual form and with usual terms." (Citations omitted.) "The nature and extent of an agent's authority is a question of fact for the trier where the evidence is conflicting or where there are several reasonable inferences which can be drawn." Id., 126.

In the present case, the trial court's ruling is most reasonably understood as being premised on two alternate grounds: (1) Karsten, by virtue of the November 26, 1991 retainer letter, was the defendants' attorney and agent in connection with their claims against the union, Pan Am and Delta, and, as such, had general authority, *as a matter of law*, to enter into a contract, binding on the defendants, relating to any matter within the scope of his agency; and (2) the November 26, 1991 retainer letter provided specific authority for Karsten to enter into the January 7, 1992 letter agreement on behalf of the defendants. We disagree with both conclusions.

the lawyer has not regularly represented the client, the basis or rate of the fee . . . shall be communicated to the client, preferably in writing . . . ." Rule 1.5. (c) provides in relevant part: "A contingent agreement shall be in writing . . . ." The defendants have provided no authority for the proposition that either rule was intended to override normal agency principles such that a communication that otherwise satisfies the rules is insufficient when it is made to an authorized agent. In any event, a violation of a rule of professional conduct does not "give rise to a cause of action nor should it create any presumption that a legal duty has been breached." Rules of Professional Conduct, Scope.

We reject the first ground because, as the foregoing cases establish, an attorney does not have general authority by virtue of the agency relationship to bind his client contractually to another attorney. We reject the second ground because we conclude that the jury reasonably could have concluded that Karsten did not have actual authority to bind the defendants contractually to the plaintiff. The trial court relied primarily on the language of the November 26, 1991 retainer letter indicating that Karsten might enter into an "affiliation with other counsel" and that, if he did so, the same fee arrangement that he had with the pilots "would be the objective." That language is ambiguous, however, in that it does not specify whether the pilots or Karsten would be primarily liable to "other counsel" for payment of fees.[18] Accordingly, while we recognize that this evidence was *sufficient* for a reasonable fact finder to make the inference that Karsten had actual authority to bind the defendants, we do not agree that the evidence was conclusive or irrefutable.

The plaintiff also argues that even if the evidence does not conclusively establish that Karsten had actual authority to bind the defendants contractually to the terms of the January 7, 1992 letter agreement, it establishes that he had apparent authority to do so.[19] In sup-

[18] The plaintiff also points to testimony by Spellacy that the "objective" referred to in the retainer letter was "to get the hundred dollars an hour agreement . . . [with] hopefully, an experienced attorney." We find this testimony to be equally ambiguous, however. In any event, in order to prove that Spellacy's understanding of the retainer letter was binding on all of the defendants, the plaintiff would have to prove that Spellacy was their agent and had actual or apparent authority to enter into the agreement for them. The evidence showing that each individual pilot was asked to execute the retainer letter raises a factual question as to whether that was the case.

[19] "Apparent authority is that semblance of authority which a principal, through his own acts or inadvertences, causes or allows third persons to believe his agent possesses. . . . Consequently, apparent authority is to be determined, not by the agent's own acts, but by the acts of the agent's principal. . . . The issue of apparent authority is one of fact to be determined based on two criteria. . . . First, it must appear from the principal's conduct that the principal held the agent out as possessing sufficient author-

port of this claim, the plaintiff points to evidence that Stewart Beckett, Spellacy and Karsten met with the plaintiff before the agreement was executed and led the plaintiff to believe that the pilots would compensate the plaintiff directly for its fees. The testimony pertaining to the December, 1991 meeting did not conclusively establish that fact, however. Although Stewart Beckett testified that the meeting participants discussed the possibility that 100 pilots each would contribute $4000 to cover litigation costs, he also testified that nothing was said about how the contributions would be assessed or who would be responsible for paying the plaintiff. Moreover, even considered in the light most favorable to the plaintiff, that evidence tends to show only that Karsten had apparent authority to enter into the January 7, 1992 letter agreement on behalf of Stewart Beckett and Spellacy. Stewart Beckett's and Spellacy's acts could not give rise to apparent authority for Karsten to bind the other pilots to the agreement, even if it is assumed that Stewart Beckett and Spellacy were the pilots' agents.[20] See *Tomlinson* v. *Board of*

---

ity to embrace the act in question, or knowingly permitted [the agent] to act as having such authority. . . . Second, the party dealing with the agent must have, acting in good faith, reasonably believed, under all the circumstances, that the agent had the necessary authority to bind the principal to the agent's action." (Citations omitted; internal quotation marks omitted.) *Tomlinson* v. *Board of Education*, 226 Conn. 704, 734–35, 629 A.2d 333 (1993).

[20] The plaintiff argues that because Stewart Beckett and Spellacy "knowingly permitted [Karsten] to act as having such authority"; *Tomlinson* v. *Board of Education*, supra, 226 Conn. 734; and because "knowledge of . . . an agent while acting within the scope of his authority and in reference to a matter over which his authority extends is . . . knowledge of . . . the principal"; *E. Udolf, Inc.* v. *Aetna Casualty & Surety Co.*, 214 Conn. 741, 746, 573 A.2d 1211 (1990); Stewart Beckett's and Spellacy's knowledge of their conduct during the meetings with the plaintiff must be imputed to the other pilots. In order to establish that knowledge of that conduct is imputable to the pilots, however, the plaintiff must first establish that Stewart Beckett and Spellacy were the pilots' agents and were acting within the scope of their authority. As the defendants point out, the language in the January 7, 1992 letter agreement indicating that the plaintiff intended to obtain "documentation from the pilots to establish our relationship consistent with

*Education,* 226 Conn. 704, 734, 629 A.2d 333 (1993) ("apparent authority is to be determined, not by the agent's own acts, but by the acts of the agent's principal"). A fortiori, Karsten could not have had apparent authority to bind any of the defendants who had not yet indicated that they intended to join the litigation. Accordingly, we conclude that the evidence does not conclusively establish that Karsten had apparent authority to bind all of the defendants to the January 7, 1992 agreement.

Finally, the plaintiff argues, essentially as an alternate ground for affirmance, that the evidence conclusively establishes that the defendants have a contractual obligation to the plaintiff under the doctrine of ratification.[21] In support of this claim, the plaintiff relies on the evi-

---

the retainer letters" raises a factual question as to whether that was the case. In any event, to the extent that the general principle that knowledge of an agent is imputable to a principal is inconsistent with the more specific principle that "apparent authority is to be determined, not by the agent's own acts, but by the acts of the agent's principal"; *Tomlinson* v. *Board of Education,* supra, 734; we conclude that the more specific principle applies in cases involving the doctrine of apparent authority. It follows that if Karsten, acting as a subagent of Stewart Beckett and Spellacy, had only apparent authority from Stewart Beckett and Spellacy, acting as the pilots' agents, their actions would not bind the other pilots.

[21] "As a general rule, [r]atification is defined as the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account. . . . Ratification requires acceptance of the results of the act with an intent to ratify, and with full knowledge of all the material circumstances. . . . In order to ratify the unauthorized act of an agent and make it effectual and obligatory upon the principal, the general rule is that the ratification must be made by the principal with a full and complete knowledge of all the material facts connected with the transaction to which it relates . . . . Since ratification in a given case depends ultimately upon the intention with which the act or acts, from which ratification is claimed, were done, and since intention is a mental fact and its finding clearly one of fact, the finding in a given case of ratification is one of fact . . . ." (Citations omitted; internal quotation marks omitted.) *Il Giardino, LLC* v. *Belle Haven Land Co.,* 254 Conn. 502, 530–31, 757 A.2d 1103 (2000). "[T]he jury may find that a party ratified a transaction only if the jury finds an intent to ratify it." *Russell* v. *Dean Witter Reynolds, Inc.,* 200 Conn. 172, 186, 510 A.2d 972 (1986).

dence showing that: (1) at least some of the defendants received Karsten's January 22, 1992 letter referring to the plaintiff as "the law firm we have associated with to pursue this litigation" and enclosing a copy of the complaint in the duty of fair representation action; (2) the plaintiff communicated directly with some of the defendants concerning discovery matters and defended several defendants during their depositions; (3) Stewart Beckett and Spellacy wrote to the defendants and apprised them of some of the plaintiff's activities; and (4) each of the defendants authorized the application of the settlement proceeds from the settlement of the Delta action to the plaintiff's outstanding fees. We do not consider it necessary to engage in a detailed analysis of this evidence. It is adequate to state again that, although the evidence was sufficient to permit an inference that at least some of the defendants had ratified the contractual obligations entered into by Karsten, it does not establish as a matter of law that any or all of the defendants had the "full and complete knowledge of all the material facts connected with the [January 7, 1992 letter agreement]"; *Il Giardino, LLC* v. *Belle Haven Land Co.*, 254 Conn. 502, 530, 757 A.2d 1103 (2000); required for ratification, or that the defendants had the requisite intent to ratify the agreement. See *Russell* v. *Dean Witter Reynolds, Inc.*, 200 Conn. 172, 186, 510 A.2d 972 (1986).

In summary, we conclude that the trial court improperly determined that Karsten had general authority as a matter of law to bind the defendants contractually to the plaintiff. Moreover, although we recognize that there is evidence supporting the plaintiff's claim that the defendants, or at least some of them, are contractually bound to pay the plaintiff for its services, either because Karsten had specific authority to bind them or because they ratified the contract, we conclude that that evidence is not so compelling that "the jury could not

reasonably and legally have reached any other conclusion." *Berry* v. *Loiseau,* supra, 223 Conn. 819. Accordingly, we reverse the judgment of the trial court directing a verdict for the plaintiff on count one of its third amended revised complaint alleging breach of contract.

## II

We next address the defendants' claim that the trial court improperly directed a verdict for the plaintiff on the defendants' counterclaims of negligent and intentional misrepresentation. We agree.

In their amended and revised counterclaim, the defendants alleged that the plaintiff represented that the fees would not exceed $450,000 and, when the fees had exceeded that amount, that the plaintiff did not expect the defendants to pay them because they were being generated to support an award of attorney's fees. They also claimed that the plaintiff misled them by failing to obtain permission to represent them and by leading the defendants to believe that only experienced attorneys would work on the actions. They alleged that this conduct constituted negligent and intentional misrepresentation and that, as a result of the conduct, the plaintiff owed the defendants money for fees that it had collected from them. On May 2, 2001, the plaintiff moved for directed verdict on the defendants' counterclaim. On May 3, 2001, the trial court granted the motion on all counts except the CUTPA count.

The defendants claim on appeal that they presented sufficient evidence at trial to submit to the jury their claims that: the plaintiff negligently or intentionally misrepresented that its fees would be no more than $400,000[22] for all three cases; only experienced attor-

---

[22] Although the defendants' alleged in their revised amended complaint that the plaintiff represented that the total fee would not exceed $450,000, the testimony at trial was that Shortell represented that the fees would not exceed $400,000.

neys would handle the cases; Shortell and Neubert would be primarily responsible for handling the cases; Suzann Beckett would be allowed to handle the funds and be involved in the cases to the extent that she chose; experienced attorneys would be charged at a reduced hourly rate; paralegals would not be billed; the plaintiff would work primarily on the age discrimination action; and the proceeds from the settlement of the action against Delta would pay for fees through the completion of all litigation. They further argue that there is conclusive evidence that the pilots relied on these representations, were induced to act by them and were injured by their reliance.

The plaintiff counters that the defendants raised only two of these claims in its amended revised counterclaim, namely, that the fees would not exceed $450,000 and that Shortell represented that the defendants would not actually have to pay the bills. Therefore, it argues, the defendants were barred from raising the other claims. See *Journal Publishing Co.* v. *Hartford Courant Co.*, 261 Conn. 673, 686, 804 A.2d 823 (2002) ("the right . . . to recover is limited by the allegations of the complaint"). The plaintiff also argues that, with respect to the two claims made in the complaint, no reasonable fact finder could have found that the plaintiff had engaged in negligent or intentional misrepresentation.

Our review of the defendants' amended revised counterclaim satisfies us that the defendants adequately alleged that the plaintiff represented that fees would not exceed $450,000, that Shortell represented that the defendants would not have to pay the bill, and that the plaintiff misled the defendants to believe that experienced attorneys would work on the actions starting at $100 per hour. We note that the defendants have not briefed their claim that Shortell's statement during the trial of the action against the union that the defendants

would not have to pay the bills constituted culpable misrepresentation and, therefore, we deem that claim abandoned. Accordingly, our review is limited to the defendants' claims that the trial court improperly directed a verdict on their claims that the plaintiff negligently or intentionally misrepresented that the fees would not exceed $400,000 and that only experienced attorneys would work on the actions at reduced rates starting at $100 per hour.[23]

"This court has long recognized liability for negligent misrepresentation. We have held that even an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth. . . . The governing principles are set forth in similar terms in § 552 of the Restatement Second of Torts [1977]: One who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." (Citations omitted; internal quotation marks omitted.) *D'Ulisse-Cupo* v. *Board of Directors of Notre Dame High School,* 202 Conn. 206, 217–18, 520 A.2d 217 (1987).

"The essential elements of an action in fraud, as we have repeatedly held, are: (1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury." *Miller* v. *Appleby,* 183 Conn. 51, 54–55, 438 A.2d 811 (1981).

We first consider the defendants' claim pertaining to the plaintiff's cost estimate. The defendants presented

---

[23] The standard of review for the granting of a directed verdict is set forth in part I of this opinion.

testimony by Suzann Beckett that Shortell had represented that, based on his experience, he believed that the fees would be between $200,000 to $400,000. There was no evidence that Shortell indicated that this was a minimum estimate or a rough estimate. Nor did he indicate that it was extremely difficult to estimate the cost of such actions. The evidence established that, within the first several months of the litigation, the plaintiff charged the defendants for hundreds of hours of services.[24] Ultimately, the plaintiff's bills amounted to more three times the original estimate.

We conclude that this evidence was sufficient to support an inference that the plaintiff either knew or should have known, if not before it began providing services to the defendants, at least very shortly thereafter, that the $200,000 to $400,000 estimate was grossly inaccurate. We also agree with the defendants that this evidence was sufficient to support an inference that the defendants were induced by the initial cost estimate to pursue the litigation. The purpose of providing an estimate was to allow the defendants, at the outset, to make an informed choice as to whether to initiate litigation. A reasonable jury could infer that, the lower the cost to the defendants, the more attractive the option of litigation would be to them. Thus, we conclude that there was prima facie evidence to support the first three elements of a claim for misrepresentation, namely, that: (1) the plaintiff, in the course of its profession, supplied false information for the guidance of the defendants in their business affairs; (2) the defendants were induced to act by the information; and (3) the plaintiff either failed to exercise reasonable care or competence in providing the estimate or knowingly provided a false estimate.

---

[24] The defendants stated in their brief to this court that, "in [the first] five months [the plaintiff] had billed the pilots more than $99,000, not including Karsten's time. This was one quarter of the amount Shortell had estimated for all the attorney's fees over a four year period."

The injury element requires additional analysis. We note that the defendants make no claim that the plaintiff misrepresented the likelihood of success in the actions. They claim only that the plaintiff misrepresented the cost to them. In other words, the defendants do not claim that the "value of what [they have] received in the transaction"; 3 Restatement (Second), Torts § 552B (1) (a) (1976);[25] was less than what they had bargained for. They argue only that the "value given for it"; id.; was greater than they had been led to expect. Accordingly, no reasonable fact finder could conclude that the defendants were not obligated to pay $400,000 for the plaintiff's services. Fees paid in excess of $400,000 reasonably could be found to constitute a compensable pecuniary loss, however. The evidence shows that the defendants paid $468,088.07 in fees. Thus, we conclude that a jury reasonably could find that the defendants incurred a compensable pecuniary loss. We also note that a determination by the jury that the defendants have established their claim of negligent or intentional misrepresentation would constitute a special defense to the plaintiff's contract claim seeking payment of fees above the $468,088.07 already paid by the defendants. Reviewing the evidence in the light most favorable to the defendants, as we must, we conclude that the defendants established a prima facie case of negligent and intentional misrepresentation in connection with the plaintiff's cost estimate.

The plaintiff argues, however, that the fact that the inaccuracy of the cost estimate became apparent very

---

[25] Section 552B (1) of the Restatement (Second) of Torts provides: "The damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause, including

"(a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and

"(b) pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation."

early in the litigation shows that the defendants could not have justifiably relied on the $400,000 estimate. We disagree. The defendants reasonably could have believed that the initial bills were high in relation to the total estimate because the bulk of the costs would be incurred early in the litigation. The jury reasonably could have concluded that it was incumbent on the plaintiff, which held itself out as being experienced in this type of litigation, to inform the defendants, as soon as it became aware, that that was not the case and that the initial cost estimate was inaccurate.[26] Moreover, as we discuss more fully in part III of this opinion, the defendants' options were constrained because, by the time they became aware that the original estimate was inaccurate, they already had incurred substantial costs.

With respect to the plaintiff's claim that the defendants agreed to pay fees in excess of $400,000 when they ratified the contract, we have concluded in part I of this opinion that whether any or all of the defendants ratified the contract is an issue for the jury. The enforceability of such a ratification under the special rules governing the creation of fee contracts between attorneys and clients is discussed in part III of this opinion.

We next consider the defendants' claim that the plaintiff negligently or intentionally misrepresented that only experienced attorneys would work on the litigation at reduced rates starting at $100 per hour. In support of this claim, the defendants point to the January 7, 1992 letter agreement, which states that Karsten had "signed retainer letters with approximately 55 pilots agreeing to an hourly rate of $100, with annual increments of $10.00, plus a 20 [percent] contingency fee. You have agreed to assist us in obtaining any reasonably necessary documentation from the pilots to establish our

---

[26] See part III of this opinion for a discussion of the plaintiff's fiduciary duties to the defendants.

relationship consistent with the retainer letters." The defendants also presented evidence that Shortell had represented that he and Neubert would be responsible for handling the case and that "there would not be heavy use or really any use of associates." They also point to evidence tending to show that Shortell had little involvement in the actions, that attorneys who had never litigated labor or employment cases were placed in charge of the litigation and that relatively inexperienced attorneys were charged at rates exceeding their normal fees.

The defendants argue that the January 7, 1992 letter agreement must be read in light of the November 26, 1991 retainer letter, in which Karsten had agreed to reduce his hourly rates by 43 percent to $100. We disagree. The January 7, 1992 letter agreement evinces a clear intent to charge a flat hourly rate for all attorneys, not a percentage of an attorney's normal hourly rate with a cap of $100. At most, inconsistencies between the November 26, 1991 retainer letter and the January 7, 1992 letter agreement may be relevant for purposes of establishing Karsten's authority to enter into the January 7, 1992 agreement. Accordingly, we conclude that the January 7, 1992 agreement cannot reasonably be interpreted to mean that the plaintiff had agreed to charge for any of its attorneys at a rate lower than $100 per hour. Furthermore, the defendants have not identified any specific evidence that the assignment of relatively inexperienced attorneys to their cases injured them in any way.[27] Accordingly, we conclude that the defendants have not established a prima facie case that

---

[27] The plaintiff presented evidence, for example, that the associate attorneys who worked on the case expended an enormous amount of time processing and reviewing discovery requests and responses and conducting depositions. The defendants have not explained how they would have benefited significantly if Shortell and Neubert had performed all of these tasks themselves, and it is far from clear that it would have been possible for Shortell and Neubert to do so without any assistance.

the plaintiff misrepresented the hourly fees that would be charged or the level of experience of the attorneys who would work on the case.

Having determined that the defendants established a prima facie case of negligent or intentional misrepresentation with respect to the plaintiff's cost estimate, we conclude that the trial court improperly directed a verdict in favor of the plaintiff on these claims.

### III

We next consider the defendants' claim that the trial court improperly directed a verdict for the plaintiff on the defendants' counterclaim for legal malpractice and breach of fiduciary duty. We agree, but for reasons slightly different from those propounded by the defendants.

The defendants alleged in count two of their revised amended answer and counterclaim that the plaintiff had "failed to conform to the appropriate standard of professional care and caused the [defendants'] injury." At trial, the defendants presented testimony by their expert witness, William H. Clendenen, an attorney, that an attorney has the responsibility, at the beginning of the relationship, to disclose to a new client clearly and completely the types of fees and expenses that will be charged to the client, to inform the client when an initial estimate has turned out to be incorrect, to give a corrected estimate and to disclose whether and how the client will be charged for the services of nonattorneys and disbursements. He also testified that, when an attorney has failed to do so, he "has not met the appropriate standard of care as it relates to his or her fiduciary obligations."[28]

---

[28] "[A]n attorney-client relationship imposes a fiduciary duty on the attorney . . . characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." (Citation omitted; internal quotation marks omitted.) *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 56, 717 A.2d 724 (1998).

As we have noted, on May 2, 2001, the plaintiff moved for a directed verdict on the defendants' counterclaim. The trial court ruled that, because ethical disclosure rules for attorneys apply only to lay clients, and the plaintiff in this case had contracted with Karsten, there could have been no breach of fiduciary duty. The court also indicated that, even if there had been a breach of fiduciary duty, the court had doubts as to whether the defendants had established any damages. Accordingly, the court directed a verdict for the plaintiff.

"Malpractice is commonly defined as the failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss, or damage to the recipient of those services . . . ." (Internal quotation marks omitted.) *Davis* v. *Margolis*, 215 Conn. 408, 415, 576 A.2d 489 (1990). "In general, the plaintiff in an attorney malpractice action must establish: (1) the existence of an attorney-client relationship; (2) the attorney's wrongful act or omission; (3) causation; and (4) damages." *Mayer* v. *Biafore, Florek & O'Neill*, 245 Conn. 88, 92, 713 A.2d 1267 (1998).

In the present case, the defendants rely on *Schultz* v. *Harney*, 27 Cal. App. 4th 1611, 33 Cal. Rptr. 2d 276 (review denied December 21, 1994), for the proposition that breach of fiduciary duty is a form of legal malpractice. In that case, the court concluded that an allegation that an attorney charged a client a fee higher than that permitted by statute was "sufficient to charge an act of professional negligence." Id., 1621. The defendants also argue that Clendenen's testimony provided a sufficient evidentiary basis for the claim of legal malpractice to be submitted to the jury. Finally, they argue that the trial court's conclusion that the plaintiff had no fiduciary duty to the defendants was premised on its

conclusion that the January 7, 1992 letter agreement was between Karsten and the plaintiff, not between the defendants and the plaintiff, and that that conclusion was inconsistent with the conclusion that the defendants are contractually bound to the plaintiff.

The plaintiff counters that the defendants are bound by the terms of the January 7, 1992 letter agreement, and, therefore, the premise of their claim, that Shortell failed to disclose the fee arrangement, is without foundation. It further counters that the defendants have not established that they were damaged by the inaccurate estimate, that the defendants waived any requirement for a revised estimate, that the defendants were aware very early on that the initial estimate was inaccurate, and that the $400,000 estimate was not a cap on fees. The plaintiff also argues, essentially as an alternate ground for affirmance, that the defendants' claim must fail because the trial court improperly allowed Clendenen to testify as to a legal opinion, thereby invading the province of the trial court to instruct the jury on the requirements of the law. Finally, the plaintiff reciprocates the defendants' claim of inconsistency. It points out that, if, as the defendants claim, the plaintiff breached a fiduciary duty to the defendants, then the defendants must have been the plaintiff's clients, which the defendants deny.

We begin our analysis by addressing the plaintiff's last argument. We agree that the plaintiff could have breached its fiduciary duty to the defendants only if the defendants were its clients. As the defendants point out, however, the converse is also true. If, as the trial court found, the plaintiff had *no* fiduciary duty to the plaintiff, then the plaintiff and the defendants could *not* have had an attorney-client relationship. Thus, we cannot reconcile the trial court's conclusion that, as a matter of law, the plaintiff had no fiduciary duty to the defendants with its conclusion that, as a matter of law,

the defendants were the plaintiff's clients by virtue of the January 7, 1992 letter agreement. Accordingly, we conclude that, if the letter agreement constituted a contract between the plaintiff and the defendants, then the plaintiff owed a fiduciary duty to the defendants.

We also conclude that the trial court improperly directed a verdict for the plaintiff on the defendants' malpractice claim. Although the defendants characterize the counterclaim as sounding in legal malpractice, we believe that the real question in issue is whether a contract entered into during the existence of the attorney-client relationship is unenforceable as violating public policy. See *DiFrancesco* v. *Goldman*, 127 Conn. 387, 392, 16 A.2d 828 (1940) (discussing respective enforceability of contract made before relationship of attorney and client has commenced and contract made during relationship). In other words, the defendants claim in effect that, even if it is assumed that they impliedly agreed to pay the disputed fees after retaining the plaintiff, the plaintiff's failure to disclose at the outset of the relationship that those fees would be charged and to provide an accurate estimate of the total cost of litigation was a breach of fiduciary duty rendering any such agreement void.[29] As we stated in *DiFrancesco*, however, a contract for legal fees entered into "after the commencement of the relationship of attorney and client is not per se void but will by reason of the confidential nature of the relationship be closely scrutinized by the court." Id., 393. Such an agreement "should not be set aside or the agreed compensation

[29] To the extent that the defendants claim that there was no agreement to pay the disputed fees, implicit or otherwise, because the plaintiff's failure to disclose essential terms of the contract precluded a meeting of the minds, any such claim would fall not under the rubric of breach of fiduciary duty, but contract formation. In other words, if there was no meeting of the minds, then there could be no claim under *DiFrancesco*, which deals solely with the enforceability of contracts entered into during the attorney-client relationship, not the formation of such contracts.

withheld unless fraud has been perpetrated, undue influence exerted, material facts affecting the subject matter misrepresented or suppressed, or advantage taken of a position of confidence and trust to obtain an unconscionable advantage over the party, in which case a court of equity may grant relief from such oppression, and the attorney will be confined to a reasonable charge for compensation without regard to the attempted fixation of the value of his services." (Internal quotation marks omitted.) Id.; see also annot., 13 A.L.R.3d 701, 710 (1967) ("the great majority of the cases dealing with the question support the rule that a fee contract made during the existence of an attorney-client relationship is valid and enforceable if it is fair and equitable"); 13 A.L.R.3d, supra, 729–31 (citing cases).[30] The burden is on a fiduciary to prove by clear and convincing evidence that he has met his fiduciary obligations. See *Cadle Co.* v. *D'Addario*, 268 Conn. 441, 455–56, 844 A.2d 836 (2004).

We have concluded in part II of this opinion that, in the present case, the trial court improperly directed a verdict for the plaintiff on the claims of negligent and intentional misrepresentation because the defendants established a prima facie case that the plaintiff had failed to exercise reasonable care or competence or knowingly or intentionally made false statements to the defendants when it provided an initial cost estimate of

---

[30] In light of these authorities, which were not cited by either party in connection with the defendants' claim for breach of fiduciary duty, we agree with the plaintiff that Clendenen's testimony that an attorney's failure to specify clearly all terms of the fee arrangement at the outset of the attorney-client relationship constitutes a breach of fiduciary duty amounted to an improper legal opinion on the ultimate issue in the case. See *Webster Bank* v. *Oakley*, 265 Conn. 539, 551 n.10, 830 A.2d 139 (2003) (witness is incompetent to offer legal opinion except on issue of foreign law). Under Connecticut law, the failure to establish all of the terms of payment at the outset of the attorney-client relationship does not constitute a breach of fiduciary duty per se. See *DiFrancesco* v. *Goldman*, supra, 127 Conn. 393. That question must be determined by the fact finder on a case-by-case basis.

$200,000 to $400,000. If the jury determines that the plaintiff engaged in misrepresentation or fraud at the outset of the relationship, it reasonably could determine that any agreement to pay fees in excess of $400,000 entered into thereafter was the result of such misrepresentation or fraud. It has been recognized that "[c]ontracts signed under an attorney's threat to withdraw from the case [are voidable] because of undue influence and the relatively helpless situation of the client, who would otherwise be forced into the often impractical alternative of starting all over again with another attorney who is unfamiliar with the case." Annot., 13 A.L.R.3d 743 (1967).[31] We find this reasoning persuasive. In the present case, by the time that it became clear that the costs of the litigation were going to exceed greatly the plaintiff's original estimate, the defendants already had invested a large amount of money in the actions. A reasonable fact finder could determine that, at that point, the defendants' options with respect to the litigation were constrained unfairly. Thus, a reasonable fact finder could find that any fee contract entered into under these circumstances should be set aside. In addition, a reasonable fact finder could determine that, if the agreement to pay in excess of $400,000 was the result of the plaintiff's misrepresentation, a "reasonable charge" would be the amount of the original cost estimate. Accordingly, we conclude that the trial court improperly directed a verdict for the plaintiff on this counterclaim.

We disposed in parts I and II of this opinion of the plaintiff's arguments that the claim of breach of fiduciary duty must fail (1) because the defendants are bound by the January 7, 1992 letter agreement, (2)

---

[31] Although there was no evidence in this case that the plaintiff expressly threatened the defendants with withdrawal from the cases, there was evidence that the plaintiff was considering withdrawal if the fees were not paid and the defendants were aware of that fact.

because they were not harmed by any failure to provide an accurate cost estimate, and (3) because they knew very early on that the original cost estimate was inaccurate. The plaintiff also claims that the defendants waived any requirement for a revised cost estimate. Ordinarily, the burden is on an attorney, as the client's fiduciary, to disclose all material facts relating to the representation of the client as they become known, without a demand for such disclosure. See *DiFrancesco* v. *Goldman*, supra, 127 Conn. 393. Whether the plaintiff met this fiduciary obligation or the defendants waived it is a question for the jury. Accordingly, we reject this claim.

## IV

We next consider the defendants' claim that the trial court improperly found for the plaintiff on their CUTPA claim. We agree.

The defendants alleged in count five of their revised amended counterclaim that the plaintiff's conduct was "a practice and policy of the [plaintiff] and constitutes a violation of [CUTPA]." As we have noted, the parties agreed that the claim would be submitted to the court for decision. On March 4, 2002, the court issued its ruling that judgment would enter for the plaintiff on the counterclaim. The court stated that "[i]f each defendant had hired a separate law firm to represent them, then each defendant would probably have incurred legal fees in excess of $100,000. The defendants chose to pool their resources and save themselves lots of money in legal fees. The plaintiff undertook the representation of the defendants even though the number of defendants involved (at one time over 100) greatly increased the difficulties of an already difficult federal action against a powerful, well represented union. Notwithstanding the huge savings afforded to each defendant by the plaintiff law firm, once the defendants lost their case

at the appellate level, they failed to honor their obligation to pay their legal fees." The court concluded that, "[r]ather than the plaintiff attempting to take unfair advantage of the defendants, the court finds that the defendants took unfair advantage of the plaintiff . . . ."

The defendants claim on appeal that there was no evidentiary basis for the court's finding that each defendant would have had to pay in excess of $100,000 if they had not been jointly represented by the plaintiff. They argue that Stewart Beckett's testimony that he felt that, if 100 pilots participated in the actions and each contributed $4000, the actions would be affordable, indicated that the pilots would not have proceeded with the actions if they had known that the cost would be significantly more than that. They further argue that the trial court simply failed to address the merits of their claim that the plaintiff had engaged in unethical or unscrupulous behavior by: engaging in a "bait and switch scheme"; evading the rules of professional conduct regarding fee agreements; deliberately deciding not to obtain fee agreements from each defendant; violating the promises that Shortell would be in charge of the litigation, that inexperienced attorneys would not be used and that paralegals would not be charged; charging $100 for inexperienced attorneys; inflating the bill for purposes of obtaining an award of attorney's fees; charging for disbursements for which the defendants were not responsible; forcing Suzann Beckett out of the case; and billing more than three times the amount of the original estimate.

"It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as

it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." (Internal quotation marks omitted.) *Hartford Electric Supply Co.* v. *Allen-Bradley Co.*, 250 Conn. 334, 367–68, 736 A.2d 824 (1999).

We previously have concluded that CUTPA does not provide a private cause of action against an attorney by his client's opponent because such a cause of action would infringe unduly on the attorney-client relationship. See *Larsen Chelsey Realty Co.* v. *Larsen*, 232 Conn. 480, 495–96, 656 A.2d 1009 (1995). We also have concluded that "the entrepreneurial aspects of the practice of law, such as attorney advertising, remain well within the scope of CUTPA." Id., 496 n.19. The plaintiff makes no claim that the conduct of a law firm in obtaining business and negotiating fee contracts does not fall within such "entrepreneurial aspects of the practice of law"; id.; and we can perceive no reason that it should not. Accordingly, we conclude that CUTPA provides a cause of action under these circumstances.

"To the extent that the defendant is challenging the trial court's interpretation of CUTPA, our review is plenary. . . . [W]e review the trial court's factual findings under a clearly erroneous standard. . . . Appellate courts do not examine the record to determine whether the trier of fact could have reached a different conclusion. Instead, we examine the trial court's conclusion in order to determine whether it was legally correct and factually supported." (Citations omitted.) *Hartford*

*Electric Supply Co.* v. *Allen-Bradley Co.*, supra, 250 Conn. 367.

We agree with the defendants that the record does not support the trial court's factual finding that each defendant probably would have paid in excess of $100,000 if they had retained separate counsel, and that finding was, therefore, clearly erroneous. In addition, although we agree with the trial court that a litigation involving 100 plaintiffs is likely to be more difficult than a litigation involving a small number of plaintiffs, the evidence establishes that the plaintiff knew from the very beginning that approximately 100 pilots would be participating in the actions. It is also clear that the very reason for bringing joint actions instead of multiple actions was that a joint action would be more efficient and would reduce the cost per pilot. Accordingly, the court's finding that the large number of pilots "greatly increased the difficulties of an already difficult federal lawsuit" is unfounded, as is any suggestion that the large number of pilots ultimately involved in the actions explained the large discrepancy between the original cost estimate and the actual cost of the litigation.

It is apparent that the trial court's legal conclusion that the plaintiff had not violated CUTPA was based not only on these erroneous factual findings, but on the court's prior conclusions that, as a matter of law, the plaintiff had not engaged in negligent or intentional misrepresentation or breached its fiduciary duty to the defendants. We have concluded, however, that the defendants presented sufficient evidence in support of those counterclaims for them to be presented to the jury. Although a determination by the jury that the defendants had proven these counterclaims would not necessarily compel a conclusion that the plaintiff had violated CUTPA; see *Calandro* v. *Allstate Ins. Co.*, 63 Conn. App. 602, 617, 778 A.2d 212 (2001) (not every misrepresentation rises to level of CUTPA violation);

the trial court's improper determinations that the defendants had not established even a prima facie case of misrepresentation or breach of fiduciary duty seriously undermine its conclusion that CUTPA had not been violated. Accordingly, we conclude that that conclusion was improper. On remand, the CUTPA counterclaim should be considered in light of the fact finder's determinations on the misrepresentation and breach of fiduciary duty counterclaims.

V

The plaintiff's first claim on cross appeal is that the trial court improperly submitted to the jury the question of whether the defendants' obligation to the plaintiff was joint and several or several only under the terms of the January 7, 1992 letter agreement. We disagree.

The following procedural history and facts are relevant to our resolution of this claim. On October 30, 2000, the defendants filed a motion for partial summary judgment in which they argued that the undisputed facts established as a matter of law that the defendants were not jointly and severally liable to the plaintiff. The plaintiff objected on the ground that "the facts relied upon by the defendants for their position that they are not jointly and severally liable, are in dispute and must be left for the trier of fact to determine." On March 14, 2001, the trial court denied the motion. The court quoted the language from this court's decision in *Schubert* v. *Ivey*, 158 Conn. 583, 587–88, 264 A.2d 562 (1969), that, "where two or more promisors enter into an agreement with a third party for one performance, there is a presumption that the promisors are contracting jointly in the absence of words of severance in the contract." It concluded, however, that "[t]here [were] issues of fact with respect to the intent of the parties which may rebut the presumption . . . [and] must be decided at trial."

On March 30, 2001, the plaintiff filed a motion in limine asking the court to preclude the defendants from offering any testimony on the issue of their intent with regard to joint and several liability at the time that they entered into the fee agreement. It argued that the evidence was inadmissible because the contract clearly and unambiguously provided for joint and several liability. The trial court excluded certain evidence on this issue at trial, but did not grant a blanket preclusion of all such evidence.

After the conclusion of evidence, the plaintiff filed a supplemental request to charge in which it asked the court, "to the extent [that it] intends to give the jury a charge on joint and several liability," to instruct the jury that, under *Schubert*, there is a presumption that the defendants contracted jointly and severally with the plaintiff and that the defendants had the burden of rebutting that presumption by offering substantial countervailing evidence. The court instructed the jury that "[t]he contract between the [defendants] and [the plaintiff] dated January 7th, 1992, contains no words of severance. Therefore, there is a presumption that the [defendants] are jointly and severally liable to [the plaintiff] for the amount of fees and disbursements owed under the contract. In order to overcome this presumption, the defendants must prove by a preponderance of the evidence that both [the plaintiff] and the [defendants] intended the obligation of the [defendants] under the contract to be several, with each [defendant] owing only his pro rata share rather than joint."

The plaintiff excepted to the charge, stating that, "as we've maintained, that's a question of law for the court. Secondly, there are no facts that have been introduced into evidence that are either relevant or [disputed] that would allow the jury or to permit the jury to make a decision on that issue." Shortly thereafter, counsel for the plaintiff stated: "let me just clarify, the charge as

given on joint and several liability I took no exception to. I thought if Your Honor decided to charge, that was an appropriate charge. Just to clarify that."

The following question was contained in the verdict form submitted to the jury: "Have the [defendants] proven by a preponderance of the evidence that *both* [the plaintiff] and the [defendants] intended the obligation of the [defendants] under the contract to be several, with each [defendant] owing only his pro rata share." (Emphasis in original.) The jury answered "yes" to that question.

The plaintiff argues on appeal that, in the absence of any express contract language providing that the defendants' obligation was several only and of any evidence overcoming the presumption that the defendants were jointly and severally liable to the plaintiff, no reasonable jury could have found that their liability was several only. Accordingly, it argues, the trial court improperly submitted the issue to the jury.

The plaintiff relies on this court's decision in *Schubert* v. *Ivey*, supra, 158 Conn. 583, to support its position. That case involved a sale by the plaintiff to the three defendants of the plaintiff's stock in a corporation and a promissory note from the corporation. The sales contract provided for the sale of the stock and note "in return for three promissory notes, 'in the full amount of $60,000', each signed by a defendant, each in the amount of $20,000 and each payable to the plaintiff in three equal annual installments . . . ." Id., 585. When the defendants failed to make any payments to the plaintiff, the plaintiff sold the stock for $300 and instituted an action against the defendants for the balance due on the promissory notes. The defendants argued that each of them had a several obligation to pay the plaintiff $20,000. The plaintiff argued that the contract imposed a joint obligation for $60,000. The trial court

rendered judgment against the defendants jointly in the amount of $60,000, less the $300 realized on the sale of the stock, plus interest and attorney's fees. Id., 587. The defendants then appealed to this court.

On appeal, this court stated that "[u]nder the general common-law rule, where two or more promisors enter into an agreement with a third party for one performance, there is a presumption that the promisors are contracting jointly in the absence of words of severance in the contract." Id., 587–88. We also recognized that "[t]he intention of the parties to a contract is to be determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. The question is not what intention existed in the minds of the parties but what intention is expressed in the language used." (Internal quotation marks omitted.) Id., 589. We noted that the sales contract under review provided for a sale of the plaintiff's interest in the corporation to the defendants as a group, not for the sale of one third of his interest to each of the three defendants. We also noted, however, that "[i]t is possible . . . for a contract to provide for a sale of stock to purchasers jointly as a group, as was the case here, and still provide for a several, pro rata liability for payment of the purchase price." Id. We identified the "decisive question as . . . whether the defendants' performance was a joint or several undertaking." Id., 589–90. We concluded that the "decisive feature of the contract is that nowhere is it stated that the buyers are to pay $60,000 for the . . . stock and note purchased from the plaintiff." Id., 590. Instead, the contract provided for the delivery of three separate promissory notes in the amount of $20,000. Id. We concluded that this fact established that the defendants' obligation was a several one. Id.

In the present case, the plaintiff relies on the language in *Schubert* that "where two or more promisors enter

into an agreement with a third party for one performance, there is a presumption that the promisors are contracting jointly in the absence of words of severance in the contract"; id., 587–88; in support of its argument that, because the January 7, 1992 letter agreement contained no words of severance, the defendants were, as a matter of law, jointly obligated to the plaintiff. The defendants argue that, to the contrary, *Schubert* establishes that the presumption that multiple promisors contracted jointly may be rebutted not only by express contractual provisions for several liability, but by other evidence of the parties' intent. We do not agree entirely with either party. Instead, we conclude that the dispositive issue in *Schubert* was not whether the defendants, as multiple promisors of the same performance, were jointly obligated to the plaintiff, but whether the defendants had promised the same or separate performances.

Comment (c) to § 288 of 2 Restatement (Second), Contracts (1981), states that "[i]t has often been said that when two or more persons undertake a contractual obligation they are presumed to undertake it jointly and that 'words of severance' are necessary to overcome the presumption. Such statements combine the rule of Subsection (2) [of § 288] with that of § 289 (2)." Section 288 (2) provides: "Unless a contrary intention is manifested, a promise by two or more promisors is a promise that the same performance shall be given." Section 289 (2) of 2 Restatement (Second), supra, provides: "Where two or more parties to a contract promise the same performance to the same promisee, they incur only a joint duty unless an intention is manifested to create several duties or joint and several duties." Comment (c) to § 288 further states that "the rule of [§ 288 (2)] operates in the rare case of absence of any evidence of intention; it yields to manifestations of contrary intention, whether or not there are 'words of severance.' The fact that the interests of the promisors are different,

that one receives all or most of the consideration, or that one is merely a surety does not necessarily rebut the presumption. But promises to subscribe for a common purpose sums of money set opposite the names of the promisors are ordinarily promises of separate performances."

It is also important to note that comment (c) of 2 Restatement (Second), supra, § 288, has the heading, "Presumption that the *same performance* is promised." (Emphasis in original.) Comment (b) to § 288 provides: "The question whether two promisors promise the same or separate performances is distinct from the question whether two promisors of the same performance are bound by 'joint' or by 'several' duties or by both, but the two questions are sometimes confused. The question what performances are promised is entirely a question of interpretation of the promises, while the distinction between 'joint' and 'several' duties is primarily remedial and procedural and is substantially abolished by statute in many jurisdictions."

Although this court in *Schubert* used the "words of severance" language in discussing the presumption that promisors of the same performance incur a joint duty, it is clear, in light of the fact that the contract under review in that case did not contain express words of severance, that we did not apply that rule in that case. Instead, we implicitly applied the rule alluded to in 2 Restatement (Second), supra, § 288, comment (c), that the presumption that a promise by multiple promisors is a promise that the same performance shall be given "operates in the rare case of absence of *any* evidence of intention"; (emphasis added); and "yields to manifestations of contrary intention, whether or not there are 'words of severance.' " Id. In other words, the question that we considered and answered in the affirmative in *Schubert* was whether the presumption that the multiple promisors had promised the same performance had

been rebutted.[32] It is only when that question has been answered in the *negative* that the presumption arises that promisors of the same performance incur a joint duty.

In the present case, the plaintiff argues that, under *Schubert*, the defendants' obligation was joint as a matter of law because they promised one performance and the contract did not contain words of severance. As in *Schubert*, however, the threshold question that must be answered is whether the defendants intended to promise the same performance. The trial court implicitly instructed the jury that they did when it informed them that "[i]t is the law of this state that where two or more promisors enter into an agreement with a third party for one performance, there is a presumption that the promisors were contracting jointly in the absence of words of severance in the contract."[33] We conclude, however, that there was evidence from which a reasonable fact finder could have inferred that the defendants

---

[32] Comment (a) to § 288 of 2 Restatement (Second), supra, recognizes that the phrase "same performance" is subject to different interpretations. "Thus A and B may both promise that $100 lent by C will be repaid, or that certain goods will be delivered to C, or that certain services will be rendered to C. On the other hand, each promisor may promise a separate performance, which may be similar to that promised by another. Thus where C lends $100 to A and B, A may promise to repay $50 and B may promise to repay $50. As used in §§ 288–96, 'same performance' refers to the first of these two types of situations but not to the second." Id., p. 408. Our determination in *Schubert* that each of the defendants separately owed $20,000 was a determination that they had not promised the "same performance" as that term is used in the Restatement (Second). It was not a determination that the defendants, having promised the same performance, were not jointly obligated to the plaintiff.

[33] We recognize that neither party challenges the substance of the trial court's instruction on appeal. We conclude, however, that this issue is inextricably intertwined with the plaintiff's claim on cross appeal that the issue of several liability should not have been submitted to the jury and that we cannot adequately address that claim without addressing this instructional issue.

had not intended to promise a single performance.[34] For example, each pilot signed a separate document stating, "*I* agree to participate in the litigation"; (emphasis added); several pilots had expressly indicated that their participation in the litigation would be limited to a specific dollar amount; the testimony by Stewart Beckett and Spellacy suggested that the plaintiff was aware that no single pilot could afford to pay $400,000, but each of approximately 100 pilots could afford, and therefore would agree to pay, $4000 over four years;[35]

[34] The jury was told that the defendants were required to prove that *both* the plaintiff and the defendants intended the defendants' obligation to be several only before it could make such a finding. The plaintiff has provided no legal authority for the proposition that, if the jury found that the defendants intended that their obligation would be several only and the plaintiff intended that their obligation would be joint and several, the jury must find that the obligation was joint and several. See *Cheverie* v. *Ashcraft & Gerel*, 65 Conn. App. 425, 439, 783 A.2d 474 (burden is on plaintiff to prove meeting of minds to establish its version of claimed contract), cert. denied, 258 Conn. 932, 785 A.2d 228 (2001). As we have noted, the presumption that the defendants intended to promise a single performance would arise only in the absence of any evidence of contrary intention. See 2 Restatement (Second), supra, § 288, comment (c).

[35] The plaintiff argues that evidence that the defendants intended to apportion the costs among themselves cannot support the conclusion that their obligation to the plaintiff is several only. In support of this argument, it relies on *Security Ins. Co.* v. *St. Paul Fire & Marine Ins. Co.*, 50 Conn. 233, 244–45, 718 A. 968 (1882). In that case, several insurance companies entered into an agreement to share, on a pro rata basis, the costs of defending a claim against them. Id., 235. The agreement also provided that the management of the defense was to be entrusted to a committee, which was to have authority to hire attorneys and other persons. The committee hired an expert. After the claims had been successfully defended in court, the expert submitted a bill for $5000 to the committee, which approved it. Id., 237. When the insurance companies refused to pay the bill, the expert sued and obtained a judgment for the full amount of the debt against one of the companies, Security Insurance Company (Security). Id. Meanwhile, several of the insurance companies had gone out of business. Security then sued all of the solvent insurance companies that had signed the agreement for contribution. Id., 238. Several of the companies settled with Security. The defendant, which was the only remaining signatory within the jurisdiction of the court, demurred to Security's complaint, in part on the ground that it was liable only for its pro rata portion of the debt. Id., 238–39. The demurrer came before this court on a reservation for advice. Id., 240.

and, after the jury verdict in the duty of fair representation case, the plaintiff had drafted an agreement for execution by the pilots stating that each pilot would continue to be obligated to pay "his share of attorney's fees and expenses . . . as agreed to previously . . . ." Accordingly, we conclude that the trial court should have instructed the jury that it was required to make a determination on the threshold question of whether the defendants had promised the same performance. We also conclude, however, that the court's failure to submit the issue to the jury was harmless because the defendants properly were permitted to present evidence on the issue and the jury was permitted to consider that evidence in determining whether the defendants' obligation was several only. In other words, we conclude that, although the presentation to the jury of the issue of joint and several liability was flawed, the issue was properly before the jury and the jury's determination was supported by the evidence.

The plaintiff argues that, not only did the January 7, 1992 letter agreement contain no words of severance, it expressly provided that the defendants would be jointly liable to it; accordingly, the jury should not have been permitted to consider extrinsic evidence of contrary intent. In support of this argument, the plaintiff points to the language of the agreement providing that "[o]ur agreement, as stated herein, is conditioned upon the

This court determined that the expert was entitled to sue Security alone for the entire debt and that the effect of the agreement among the insurance companies was to apportion liability among the appearing solvent companies only. Id., 244–45. This court's reasoning was not entirely clear, but the question of whether the insurance companies had promised the same performance or separate performances to pay the expert does not appear to have been an issue in the case. It was simply assumed that they had promised a single performance through the committee. The only issue in dispute was the scope of the insurance companies' obligations to each other. Accordingly, we do not agree that the case supports the plaintiff's argument that an agreement to share costs cannot constitute evidence of an intent to take on a several obligation.

establishment and maintenance of a fund by the pilots for payment of all reasonable fees and disbursements, to be billed and paid on a monthly basis." The plaintiff has provided no authority, however, for the proposition that the intent to create a fund is legally indistinguishable from the intent to promise the same performance. As we have noted, 2 Restatement (Second), supra, § 288, comment (c), indicates that that is not always the case. Id. ("promises to subscribe for a common purpose sums of money set opposite the names of the promisors are ordinarily promises of separate performances"). Accordingly, we reject this argument.

Finally, although we have concluded that the trial court properly submitted the issue of several liability to the jury and the jury's determination was supported by the evidence, we conclude that that determination is not binding on remand. Because the jury's determination in the present case that the defendants are severally liable to the plaintiff could have been the result of a compromise verdict, the issue should be submitted to the jury on retrial. See *Scanlon* v. *Connecticut Light & Power Co.*, 258 Conn. 436, 450–51, 782 A.2d 87 (2001) (when possibility of compromise verdict exists, new trial is not limited to error found but includes related issues).

## VI

The plaintiff's second claim on cross appeal is that the trial court improperly allowed Clendenen to testify about the plaintiff's fiduciary duty to the defendants in support of the defendants' counterclaim for legal malpractice. It argues that, even though the trial court directed a verdict for the plaintiff on that counterclaim, Clendenen's testimony was prejudicial to the plaintiff's breach of contract claim. We disagree.

The following facts and procedural history are relevant to our resolution of this claim. The defendants

filed a supplemental expert witness disclosure in which they indicated that Clendenen was expected to "testify about the conduct that is required and expected of lawyers in Connecticut, and which is practiced by competent attorneys, regarding the handling of fees and the disclosure to clients of fees and costs that will be charged." The plaintiff filed a motion in limine in which it argued that Clendenen's testimony should be precluded because it amounted to a legal opinion as to the validity and enforceability of the claimed contract between the plaintiff and the defendants. As we have noted, the trial court, apparently in response to the motion in limine, directed a verdict for the plaintiff on its breach of contract claim. See footnote 14 of this opinion. The court did not preclude Clendenen from testifying at that time.

Immediately before Clendenen was scheduled to testify at trial, the plaintiff reminded the trial court that the motion to preclude his testimony was still pending. The court heard arguments on the motion at that time. The plaintiff again argued that Clendenen's proposed testimony amounted to an improper legal opinion on the validity and meaning of the contract. It argued that the proposed testimony that the plaintiff's failure to disclose that certain fees and expenditures would be charged to the defendants violated the standard of care for attorneys was necessarily premised on the assumption that there had been no meeting of the minds on those matters, which was the ultimate issue to be decided by the jury. The defendants argued that the proposed testimony went to their counterclaim that the plaintiff had breached its fiduciary duty and to related special defenses. The trial court permitted Clendenen to testify with certain restrictions.

Clendenen testified that, in his opinion, an attorney who has not disclosed to a client, at the outset of the relationship, that it will be charged for nonattorney fees

and disbursements has breached his fiduciary duty to the client and violated the applicable standard of care for attorneys. He also testified that an attorney who has failed to disclose to his client that an initial cost estimate has been exceeded and has failed to provide a revised cost estimate has breached his fiduciary duty and violated the standard of care. As we have noted, the trial court directed a verdict for the plaintiff on the defendants' counterclaim for legal malpractice. The jury found that paralegal and nonattorney fees were not included within the language "reasonable fees and disbursements" contained in the January 7, 1992 letter agreement, under "the modified contract,"[36] or under a theory of quantum meruit. It also determined that the defendants' obligation was several only.

The plaintiff claims on appeal that the trial court improperly allowed Clendenen to testify on a question of law. It argues that, even though the trial court directed a verdict for the plaintiff on the legal malpractice counterclaim, the improper admission of Clendenen's legal opinion that an attorney who does not inform a client that it will be charged for nonattorney fees and disbursements is dishonest[37] was prejudicial because it was bound to have affected the jury's determination as to whether the plaintiff properly had charged for those items under the contract, as well as its determination on the issue of whether the defendants' obligation was several.

We have concluded that Clendenen's testimony constituted an improper legal opinion, albeit for reasons slightly different from those argued by the plaintiff. See footnote 30 of this opinion. We conclude, however, that

[36] The trial court instructed the jury that, if it determined that the defendants' payment of nonattorney fees constituted assent to the charges, it could conclude that a modification of the original contract had occurred.

[37] The defendants vigorously dispute this characterization of Clendenen's testimony.

it is not reasonably likely that his testimony affected the jury's determination that the contract did not include nonattorney fees and that the defendants' obligation was several only. The trial court instructed the jury that the issue of nonattorney fees was, under the breach of contract claim, purely a question of the parties' intent. It did not suggest that, if the jury found the requisite intent to include nonattorney fees, it nevertheless could render a verdict for the defendants on the ground that the contract was somehow unethical. Nor did counsel for the defendants suggest in closing argument that Clendenen's testimony had any relevance to the question of whether nonattorney fees were included in the contract. Indeed, counsel did not even allude to Clendenen's testimony. With respect to the quantum meruit claim, the trial court instructed the jury that the plaintiff must prove that the defendants accepted the nonattorney services knowing that the plaintiff expected to be compensated for them. Again, it did not suggest that, if the plaintiff proved that the defendants did so, the jury nevertheless could render a verdict for the defendants on the ground that charging the fees was unethical. Finally, the trial court instructed the jury that the question of joint and several liability was a matter of the parties' intent. It did not suggest that Clendenen's testimony had any relevance to that claim. "Our jurisprudence is clear . . . that unless there is a clear indication to the contrary, a jury is presumed to follow the court's instructions." *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.*, 267 Conn. 279, 335, 838 A.2d 135 (2004). Accordingly, we reject this claim.

## VII

The plaintiff's last claim in the cross appeals is that the trial court improperly submitted its claim for paralegal and nonattorney fees to the jury. We disagree.

The plaintiff argues that the defendants were obligated to pay for paralegal and nonattorney fees as a

matter of law because: (1) the contract language providing for "payment of all reasonable fees and disbursements" unambiguously provided for the payment of nonattorney fees; (2) even if the language was ambiguous, the contract was modified when the defendants knowingly paid the fees; and (3) even if there was no contract, the plaintiff was entitled to recover the fees as a matter of law under a theory of quantum meruit because there was conclusive evidence that the defendants knew that the plaintiff expected to be paid for its work. Specifically, the plaintiff points to the testimony that it was agreed at the September 30, 1994 meeting that the plaintiff would continue to represent the defendants and would be paid for its work. The defendants counter that the claim was not preserved for review because the plaintiff did not take exception to the trial court's instruction to the jury.

We conclude that this issue was preserved for review by virtue of the plaintiff's repeated arguments to the trial court that all of the issues in the case were questions of law to be determined by the court. We also conclude that the contract language was not unambiguous and that the evidence that bills containing fees for nonattorney had been paid did not conclusively establish that the contract had been modified to include nonattorney fees. Finally, we conclude that, although the evidence pertaining to the September 30, 1994 meeting may have been sufficient to establish that the defendants, or at least some of them, knew that the plaintiff expected to be paid for nonattorney fees, it does not conclusively establish that fact. Accordingly, we conclude that the trial court properly submitted the plaintiff's claim for paralegal and nonattorney fees to the jury. We further conclude that the jury's determination on this issue is not binding on remand. See *Scanlon* v. *Connecticut Light & Power Co.*, supra, 258 Conn. 450–51.

The judgment is reversed and the case is remanded to the trial court for a new trial.

In this opinion the other justices concurred.